FILED
CLERK
7/3/2019 11:52 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- versus -

MICHAEL BELFIORE,
Defendant

**Docket#**
15-cr-00242-JFB

U.S. Courthouse
Central Islip, New York

February 27, 2019
12:25 PM

TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S:**

**For the Government:**

**Richard P. Donoghue, Esq.**
United States Attorney

BY: **Bradley King, Esq.**
**Charles N. Rose, Esq.**
Assistant U.S. Attorney
610 Federal Plaza
Central Islip, NY 11722

**For the Defendant:**

**Donna Aldea, Esq.**
**Bruce A. Barket, Esq.**
Barket Marion Epstein
& Kearon LLP
666 Old Country Road
Suite 700
Garden City, NY 11530

**Transcription Service:**

**Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
laferrara44@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Calling case 15-cr-242, United States of America v. Belfiore.

Counsel, please state your appearances for the record.

MR. KING: Good afternoon, your Honor.

Bradley King and Charlie Rose on behalf of the United States.

THE COURT: Good afternoon.

MR. ROSE: Good afternoon.

MS. ALDEA: Good afternoon, your Honor.

Donna Aldea and Bruce Barket on behalf of Dr. Belfiore.

THE COURT: Good afternoon.

MR. BARKET: Good afternoon.

THE COURT: Good afternoon. And Dr. Belfiore is present, as well.

We scheduled this for argument on the Rule 33 motion, so I have reviewed the papers. This is the opportunity that I give to the attorneys to highlight anything they want to highlight from their papers, and I may have some questions for you.

So it's the defendant's motion, so Ms. Aldea, you get to go first.

MS. ALDEA: Your Honor, just in terms of things to highlight knowing that you've reviewed the papers

here, one thing that I would like to highlight really has to do with respect to the plea on the question of whether there's enough information before this Court now to simply grant the motion without a hearing or whether a hearing is required. And I really do think that those are the only two options based on the record that has been presented here.

Right now, based on the record as it stands, the government's main position with respect to the absence of ineffective assistance of counsel in Mr. Liotti's counsel to Dr. Belfiore to reject the plea offer that had been offered, really is on the prejudice prong and what the government argues is that the insistence, Dr. Belfiore's insistence on innocence throughout this shows that he would not have taken the plea in any event, and therefore there can be no prejudice from the advise.

And that's actually wrong for three reasons that I think are underscored by the record here. The first thing, which is really important here is that there -- all of the interviews that the government relies on, all of the information that the government relies on to show this insistence on innocence, really happens after Mr. Liotti got involved in this case.

Prior to that point, the record in this case as the government itself concedes, show that Dr. Belfiore

was wrapping up his medical practice, was in the process of closing it, and was prepared to, in fact, accept a plea.

Additionally, the second thing is the government focuses on the fact that there are numerous cases that they highlight in their papers that talk about a defendant's adherence to a position of innocence or adherence to factual innocence being a basis to find that a defendant could not have entered a plea, and therefore there would be no prejudice.

However, all of those cases deal with cases where the defendant has said from a factual standpoint that he did not participate in the crime.

So in other words, in some of the cases, some of them are homicide cases where the defendant says I didn't actually stab the person, I didn't actually murder the person, I didn't do this.

In this case, we have a very different situation from every single one of those because Dr. Belfiore never contested from a factual standpoint that he prescribed all of the pills of oxycodone that were charged by the government.

The only question here really had to do with whether there was a legitimate medical purpose, and that is a legal term of art where counsel's advice is

particularly important to a defendant making a decision about whether or not to accept a plea offer.

On this record, Mr. Liotti's advice that there was no reason to take a plea which is what Dr. Belfiore affirmed, and what this record shows, that Mr. Liotti had told him that he could win this at trial. In fact, Mr. Liotti is in his submissions to this Court, following the submission of this motion, maintains that he did actually win this case at trial, hands down, I think is the exact quote.

So on this record, you have an attorney who was objectively unreasonable in advising his client that this was a case where there would be under this term of art a legitimate medical purpose on this record.

And I would analogize this issue to Lafler v. Cooper. In that case, the United States Supreme Court was faced with a situation where a defendant's decision not to take a plea was based on his attorney's advice that the government would not be able to prove intentional murder, the element of intent, because he had shot the victim underneath the waist, below the waist.

And in that case what the Supreme Court found, ultimately the government wound up conceding the performance prong of the inquiry because the attorney's advice was objectively unreasonable because it was not

based on an understanding of the law.

In this case, Mr. Liotti's advice about their being a legitimate medical purpose about being able to defeat all of these charges was based on only two defenses that he proffered at trial; one of them was an entrapment defense, and the other one was the "Big Pharma" defense, the defense that the pharmaceutical companies were to blame.

Just as in Lafler, the attorney's advice was objectively unreasonable because it was legally incorrect to advise the client that he can't be found guilty of intentional murder because of the place that he shot the victim, and therefore should reject the plea offer. So too in this case, Mr. Liotti's advice was objectively unreasonable for the same reasons.

Specifically, with respect to the entrapment defense, the record in this case including the Rule 29 submission that Mr. Liotti gave, and the record in the transcript, shows that Mr. Liotti really did not know or understand what the entrapment defense was, and proceeded at all times with the belief that proffering that entrapment defense was not going to open the door to all of the really devastating BNE (ph.) evidence that came in.

On the point of how devastating the BNE

evidence is, I am actually going to refer to Mr. Liotti's own motion. In his Rule 29 motion, he specifically talks about the fact that the BNE evidence was prejudicial and was devastating to his client's case.

Now the reason that he believed that the door would not be opened in spite of your Honor's admonitions on the record that this would likely open the door, was because he had a legal understanding that he stated on the record that what would be required to show pre-disposition was pre-disposition of criminality, in addition to just pre-disposition to prescribe the medication.

And that view was actually affirmatively wrong and contrary to case law. In fact, there were two cases that had been expressly -- that had been decided by the Second Circuit that had expressly rejected that understanding.

So when we talk about whether Liotti was effective or whether he had some strategic basis to inform his client that he would be acquitted at trial or that he had a good chance of success, or that there was no reason to take the plea, we have to look at the background of what his legal understanding was to give that advice.

It's not enough to say that Liotti believed it

because the attorney in Lafler also believed that his client could not be convicted of intentional murder where he shot the victim below the waist.

What is required is that the attorney's advice not be based on just some belief or some opinion of a strategy but be based on a legitimate reasonable strategy which can only be made under Strickland if the attorney bases it on a knowledge and a research of the law and of the facts at issue in the case.

So Mr. Liotti's advice on the entrapment defense, which was one of the primary defenses was incorrect. His assessment that he could win this trial -- in other words, that he could do better than just a plea to one solitary count of distribution, which is all that the government -- all that Dr. Belfiore had to plead guilty to under the government's plea offer, was objectively unreasonable where it was based on a misunderstanding of the laws that related to entrapment, a misapprehension that he would not be opening the door to the devastating BNE evidence, and that advice, that assessment, was based on a fundamental lack of research and knowledge of controlling Second Circuit case law.

With respect to the Big Pharma defense, which was his only other defense, again I am actually going to underscore the ineffectiveness based on Mr. Liotti's own

submissions to this Court.

With respect to that, he actually states that his Big Pharma defense, this is in the affidavit that he submitted to this Court arguing against the granting of this Rule 33 motion, he actually states that this Big Pharma defense was nothing more than an attempt at jury nullification.

If the attorney's central defense in a case where he has told his client there is no reason to accept a plea deal, fire your prior attorney because all he wants you to do is settle the case. That's all he knows how to do. Retain me, go to trial because that's what we have on this record. If that's based on nothing more than a belief that there might be jury nullification, there is no way that that strategy or that advice can be deemed legitimate or can be deemed reasonable under Strickland.

And so those are the facts that I want to highlight here. This is not a case where we have a client who was not willing to admit his factual guilt. This is a client who admitted all of the instances, the factual instances of prescribing oxycodone on all of the occasions charged by the government.

This is not a case where there is a client who was unwilling to give up his medical license or close his

practice, and therefore no prejudice can be found. This is a client who was in the process of closing his practice, of wrapping it up, of trying to sell it, and had affirmatively stated on the record, in fact the government had stated on the record affirmatively on multiple occasions, at multiple appearances, that he was prepared to take the plea, and was just wrapping up the medical practice.

So on this record, what we have us a client who is going to take the plea, who made the mistake of meeting with a lawyer who sold him a bill of goods that was frankly false. It was false at the time that he made it.

And on performance with respect to Strickland on that aspect, the government highlights throughout its brief, throughout its submissions, that Mr. Liotti told Dr. Belfiore that he had a thirty percent chance of success at trial which the government highlights, means a 70 percent chance of being convicted.

That's actually inaccurate. The affidavit in this case which is not contested by Mr. Liotti in any way in his submission actually states that at the very first meeting -- now this would be before Mr. Liotti looked at the record, before he looked at any evidence in the case, before he did any legal research, what he actually told

him is he gave him an assurance of a win at trial, and at the first meeting, he urged him to fire Mr. Gann, hire him, and take the case to trial. He disparaged Mr. Gann by saying all attorneys like Gann do is settle.

He talked about suing Mr. Gann because he didn't do anything, and he assured me says Dr. Belfiore in his affidavit, at paragraph 5, that he would not even accept the case unless he believed there was at least a 30 percent chance of being acquitted.

Those types of representations cannot be deemed strategy. They can't be deemed legitimate strategic advice or legitimate strategic beliefs when they're based on a first meeting at which the attorney has not reviewed any of the law, and has not reviewed any of the record.

In fact, what they actually suggest is a very disturbing suggestion that this was really just about getting a retainer at that point, which is contrary to the duty of loyalty that attorneys owe to their clients as recognized by the Supreme Court in Strickland.

Additionally, that at least 30 percent chance, did not remain at least a 30 percent chance because as Mr. Liotti obtained more evidence, and discovery, and the file from prior counsel, and began to research the case, his assessment about the chance of success in this case, only grew. In fact, later on, Mr. Liotti according to

Dr. Belfiore, told him "there is no reason to take a plea". This is after the government had indicated that they were going to charge the death resulting counts which would carry mandatory minimum sentences. "No reason to take the plea".

He also assured Dr. Belfiore at that point, "We can win this," and "I can do this". And while the government says that these statements should not be believed on this record because they're self-serving and being made by a defendant who is unworthy of belief, I submit that on this record, there is nothing that would suggest to this Court that those statements are not absolutely true.

All of Liotti's submissions following this date are in keeping with this. He submitted letters to this Court, and affidavits to this Court in which he attests not only that he could have won this or should have won this trial, but that he's dumbfounded, "that he's perplexed", "that he actually did win this hands down", and that's he convinced that this Court will grant his Rule 29 motion which notably doesn't even state the correct legal standard or any legal standard at any point in that submission and is absolutely convinced that if this Court does not do so, then the Second Circuit or the United States Supreme Court is going to find that the

Rule 29 motion should have been granted.

So that submission, those submissions show that Dr. Belfiore's statements in his affirmation which should be sufficient in terms of the performance prong to require and frankly the rest of the record in terms of the prejudice prong, which would be sufficient to require granting this motion without a hearing, are absolutely worthy of belief.

To the extent that any question of fact is raised, it is not raised by Mr. Liotti's submissions. What I would note is although Mr. Liotti has written a tremendous amount, truly a tremendous amount, and has submitted voluminous papers and submissions with his prior victories in other cases, and other publications, not once does he contest the key elements that form the basis of the ineffective assistance of counsel claim on the performance prong.

In this regard, he never challenges the fact that he advised Dr. Belfiore at the first meeting that he should fire Gann and not take the plea and proceed to trial. He never once contests that he advised Dr. Belfiore that they could win this, and that they should win this. He never does that.

Instead, all he avers is that he warned Dr. Belfiore of the risks of going to trial. But warning a

client of the risk, in other words, what his sentence exposure would be, is not sufficient to constitute effective performance under Strickland's performance prong.

And again, I cite to Lafler v. Cooper with respect to that which makes it clear that when an attorney gives objectively unreasonable advice based on the controlling law, and the controlling facts of a case, then that advice cannot be deemed strategic, and cannot be deemed reasonable.

THE COURT: Well, let me ask you, and thank you for that summary, that was very thorough, I just want to focus on the prejudice prong first --

MS. ALDEA: Yes.

THE COURT: -- then I will go into the performance prong but on the prejudice prong, you said in your papers, and I think you repeated today that he was ready to plead until he had that meeting with Mr. Liotti. But I don't know that the record establishes that he was ready to plead. I understand that he waived indictment, which is some indication that he intends to plead but if you actually look at the record in this case -- first of all, we have nothing from Mr. Gann, who was representing him at the time. You haven't put in a declaration from Mr. Gann saying Dr. Belfiore was, you know, on day one or

at any point ready to plead. He was just wrapping up his affairs. The record shows, at least in my experience, an unusually long time -- usually my cases a defendant waives indictment, pleads guilty, at that moment, maybe a few weeks later here, and we've got the unusual situation where he was charged in a complaint in 2014, that gets dismissed, I guess, and then ultimately he does waive information.

So I am not sure exactly what went on in that several-month period between October 2014, and May of 2015, but I do know what went on from May of 2015 to October when he first met with Mr. Liotti, which is multiple times they went before Judge Seybert, who had the case at the time, and Mr. Gann kept asking for adjournments, saying something along the lines of what you're saying, that he is wrapping up his affairs.

But that's also consistent potentially, with someone who is not in the frame of mind where they're ready to plead guilty or not. So that's -- I think there's an ambiguity in the record, and I actually looked at Dr. Belfiore's declaration and he actually doesn't say when Mr. Gann -- he explains that Mr. Gann told him that he thought he was going to lose, and that he shouldn't go to trial, but in paragraph 4, Dr. Belfiore says during the period of time, I was considering accepting the plea,

I had a conversation with Liotti's son.

So nowhere in Dr. Belfiore's affidavit does he say based upon Mr. Gann's advice, I was completely on board, I was ready to take the plea. He kind of create -- he says I was considering. So I don't know what your response is to that. Why should I conclude that just because he waived indictment at some point, that during that many month period where Mr. Gann kept putting it off, that he was ready to plead.

MS. ALDEA: So I think the answer to that is, I guess --

THE COURT: That was a long question but --

MS. ALDEA: That's okay, I will give a long answer. The answer to that is actually threefold. The first answer is that based on the record that we have, and you're right, we don't have an affidavit from Mr. Gann with respect to what their conversations were during that period, but as an officer of the court, Mr. Gann did represent in three of the court appearances that are attached to the government's papers, I think it's in Exhibit B -- wait, no, no, no. It's in here. I am sorry. In Exhibit B, which is the court appearance of January 30th, 2015, in Exhibit C, which is the court appearance of March 27th, 2015, in Exhibit D, which is the court appearance of July 24th, 2015, that your Honor

alluded to. Mr. Gann does state explicitly as an officer of the court that Dr. Belfiore is wrapping up his practice and is prepared to take the plea -- is preparing to take the plea.

More than that, I believe that that was also communicated to the government, and was their understanding because the AUSA also states on the record that she believes that that's what's happening.

So I would rely on that --

THE COURT: Yeah, but I --

MS. ALDEA: -- factually.

THE COURT: I did look at that but again, I don't think it's quite as clear as you're saying. I think consistent with being an officer of the Court, Mr. Gann -- Dr. Belfiore could have been telling Mr. Gann I'm having, you know, thoughts about whether I should plead guilty or not.

Mr. Gann just kept saying, you know, we're close to having resolved this matter short of trial. He does relate to winding down his practice but I didn't see any comments from Mr. Gann that said your Honor, my client definitely is going to plea here. I mean, I do have lawyers that say that to me. He's definitely pleading, we just have one last thing we need to do. It seems like it may be. And good -- it's ambiguous, but

one inference you could draw from this is then when Dr. Belfiore was informed that as a result of his plea, that he could never practice again, that maybe that became a sticking point for him, the idea that he was never going to be able to a doctor again. Maybe he didn't fully understand that when he waived the indictment, I don't know.

But I just think it's ambiguous that all this time went by, Mr. Gann's asking for multiple adjournments. I don't know anything -- there was nothing in here that led me to believe that Mr. Gann again hasn't put anything into saying Dr. Belfiore told me from day one to the last day I represented him, he was always going to plead. There's nothing like that.

MS. ALDEA: Yeah, I don't -- well, the second answer to your Honor's question is that I don't believe that it's legally required for purposes of establishing prejudice in this context that there be that kind of declaration.

THE COURT: No, I am being extreme about it. I agree with you.

MS. ALDEA: Yes.

THE COURT: But it's also one piece of -- the second piece that I was going to get to which relates to this same issue, again prejudice is -- you said well,

this isn't a factual innocence situation. But it is actually a factual innocence situation because even though he wasn't disputing that he prescribed the oxycodone, one of the elements of this crime is that he has to -- good faith is a defense. Good faith -- it has to be shown that he didn't believe it was for a legitimate medical purpose.

So if Dr. Belfiore were going to plead guilty to this, one of the elements -- he just can't say yes, I distributed oxycodone and it caused the death of these -- well, that wouldn't have been part of the plea, it would have been just distribution but he has to allocute that when I prescribed those things, I did not believe they were for a legitimate medical purpose.

So that -- and he -- you weren't here for the trial but I am sure you reviewed the transcript, he testified unequivocally at the trial, under oath, that he believed that this was for a legitimate medical purpose.

So that's something that has to be addressed because for him to plead, he would have had to say the exact opposite. So this is not a situation where as you point out, someone because of whatever the lawyer is telling him, could remain silent, make the government go through the burden of proving it.

Here you had someone who took the stand, and

testified to something completely inconsistent with being able to plead guilty. So I don't know what your response is to that.

MS. ALDEA: So my response to that, and this actually ties into the prior answer as well, in his affidavit what he actually states, and this is what is legally required in terms of establishing prejudice, at paragraph 11, Dr. Belfiore states that "I have been told by Mr. Liotti that my chances of prevailing at trial were actually slim, and that the proof against me was overwhelming. The very advice Mr. Gann gave me, I would have certainly taken a plea."

And that, coupled with the incredible sentencing disparity is legally sufficient under the case law to establish prejudice. The government acknowledges that standard as well, and there's submissions.

In further answer to your Honor's question, this question of what a legitimate medical purpose is, is just as in Lafler, defined by what the attorney explains it to be.

So when we look at what Mr. Liotti believed, Mr. Liotti stated, and I believe this is consistent as well with Dr. Belfiore's testimony at trial, that as long as the defendant is being told by his patient, that the patient is in pain, and as long as the prescription on

the bottle, the instructions on the bottle say take the pill this way, it's out of his hands, whether the patient is lying, or whether the prescription instructions, the way that the instructions are written are not being followed.

So the advice that he was being given, and again, this is clear from Mr. Liotti's arguments on the record in the transcript, is that a legitimate medical purpose only requires that. It requires a patient to tell you that I am in pain, and it requires the instructions on the bottle to be written in a way so that if they're complied with, it can only be legitimate.

And that frankly just as in Lafler, the attorney's advice of it can never be intentional murder as long as you shoot below the way, is objectively wrong. That's simply not the way the courts have defined legitimate medical purpose, and frankly, it's simply an unreasonable view of what legitimate medical purpose is. It's not enough.

In this case, a competent attorney, and I believe on the affidavit at least, Gann certain told him that the evidence against him was overwhelming. A competent attorney would have said look, we've got videotapes here. We're not talking about even the death counts right now. We're talking about the advice of

reject a guilty plea to one single count of illegal distribution of oxycodone. One single count in all of the counts with the undercover officer would have been the single prescription when Dr. Belfiore told -- the undercover came in, and actually told him that he was giving the drugs to his girlfriend and Dr. Belfiore still filled that prescription.

A competent attorney would have told him here's the video, here's the evidence, here's what it shows, that you had drug testing on that date, and on that one sole date during that drug testing, he came in, he had not been taking the oxycodone, his drug tests showed conclusively that he had no oxycodone in his system which smells of diversion, and he explicitly told on videotape, told Dr. Belfiore, that he was giving drugs to his girlfriend, which is clearly diversion.

A guilty plea to that count, your Honor, would have been easy because Dr. Belfiore would have only had to admit that on that one occasion, on that one count, there was not a legitimate medical purpose.

So I vehemently disagree that he could not have allocuted to this. He didn't have to allocute to the two death counts. They weren't even on the table. He didn't have to allocute to the other 28 or however many there were, charges of illegal distribution; just to that one

sole count.

MR. BARKET: One second, Judge.

(Counsel confer)

THE COURT: But even on that one count, he -- go ahead, state your point because I don't want you to forget.

MS. ALDEA: Yeah, I mean since he just told me. And the other point on that actually is that at trial, and during his testimony, he never even spoke to that. He never even addressed that.

So your Honor's point about his testimony being contrary to an admission of guilt, it was not contrary to the admission of guilt with respect to the prescription to that undercover officer.

THE COURT: Yeah, I would have to go back and look at that but my memory is that overall, he testified that he prescribed to all of his patients it was always because he believed it was for a legitimate medical need, and I -- maybe I am wrong, maybe he wasn't asked that on the particular -- with respect to the undercover, but I am pretty confident that he said something along those lines.

MR. BARKET: No, it was --

THE COURT: No?

MR. BARKET: -- and it was actually one of the

points in the government's summation that he avoided testifying about the prescription to the undercover officer. They highlighted that in their rebuttal, that he didn't deny it, he didn't testify to it at all --

THE COURT: Okay.

MR. BARKET: -- didn't even talk about it in his summation.

THE COURT: I will go back and look at that.

MS. ALDEA: So, your Honor, I do think that it actually does have to do with the way that the term legitimate medical purposes defined him, and his understanding of the legal requirements of that.

THE COURT: The only other -- and you jumped a little bit to performance, and you keep talking about Lafler, but Lafler, it was a legal error by the lawyer, pure legal error.

Here, it's a q of whether or not the proof that Dr. Belfiore had was going to be sufficient or not, you know, or poking holes in the government's case was going to be sufficient, but one thing you're leaving out is I mean he had three experts, two on causation with respect to the deaths, but he also had an expert who was backing up what Mr. Liotti said. He had an expert who basically said that what Dr. Belfiore did here was consistent with customary medical practice and deemed for legitimate

medical purpose.

So this wasn't something that Mr. Liotti just argued to the jury, and had nothing to support it. He had both the expert -- and obviously Dr. Belfiore testified himself to that. So you haven't really mentioned that but isn't that significant, that he had an expert with a lot of credentials who sat in that chair right there, looked that jury in the eye, and said that this is consistent with a legitimate medical purpose.

MS. ALDEA: Well, the --

THE COURT: Why isn't that significant? Mr. Gann didn't have that, I don't think. So that was something Mr. Liotti was able to get that was certainly helpful for Dr. Belfiore.

MS. ALDEA: Again, the question of whether the advice was reasonable has to do with what was on the table at the time. So the advice that was given was go to trial, there's no reason to take this plea to the single count, which is why I am focusing on the undercover because the expert, no expert testified that it was a legitimate medical purpose or in keeping with common medical practice to prescribe drugs to people who you know, who have admitted to you that they're diverting the drugs.

So in order for Mr. Liotti's advice to have

been constitutionally effective or for there not have been prejudice here, what would need to be shown is that no only could he have -- that he had a reasonable belief that not only could he have gotten Dr. Belfiore acquitted of the two death resulting counts, not only could he have gotten him acquitted of all of the other twenty-something counts of illegal distribution, but he wouldn't even be convicted of a solitary one.

And that's why I think the undercover's testimony is so essential here, and the fact that it wasn't met at all by the proof, also speaks to the ineffectiveness.

I focused on the plea but part of -- there is kind of some overlap here with respect to the ineffectiveness at trial, as well, in the sense that although Mr. Liotti put Dr. Belfiore on the stand to testify, he never had Dr. Belfiore testify to some of the critical things that really established, I think, the government's case.

Number one, he never testified about the diversion. He never testified how he could continue to prescribe drugs to a patient who not only did not have the drugs in his system, but more than that, who had actually admitted on the record, that he was diverting the drugs, that he was giving them to his girlfriend.

That's the first thing, and that's the strongest one, which is why I keep focusing on that because that's the sole conviction that meant he should have taken the plea because he can't possibly do better if he went to trial.

The second thing though is that he also did not prepare Dr. Belfiore to testify to the alterations in the medical record. To have a legitimate medical purpose, and all of the experts that testified at trial acknowledged, there need to be tests that are done.

In this case, the patients did not have MRIs, did not have x-rays, did not have any kind of medical documentation showing that there was an underlying injury.

Moreover, the videotaped interactions with the undercover officer actually showed on this record that that undercover officer's chart indicated that there were certain tests that were done that actually, in fact, we know from the videotapes, were never performed. So there were falsification in the records.

Mr. Liotti put Dr. Belfiore on the stand, really? I mean frankly, I can't put it any other way than it was a lamb to the slaughter because he didn't prepare him to deal with those portions of the government's cross or those portions of the government's case. And that is very ineffective.

And I would note, I don't want to harp too much on the psychic, although I can't ignore the psychic, I would note that these critical decisions that were being made, including the question of whether Dr. Belfiore should testify at all, given the record in this case, given the interviews, given the media coverage, given his statements in the media, and the grand jury, they could all be used against him, if he took the stand.

That decision was made precisely at the time that Mr. Liotti was consulting with the psychic for 30-minute intervals, every single day, sometimes more than once a day.

So to say that that strategic decision is not being influenced based on or is being made based on a reasonable or a legitimate strategic decision or assessment of the facts is just not reasonable on this record, where it's being tainted, and it's being colored by all of these things.

Additionally, your Honor, I think that another problem with this is that Mr. Liotti in his own summation never addressed the question of the diversion, never addressed the question of why the charts were showing falsifications, in other words, tests that were done that really weren't done, all of that was ignored in Mr. Liotti's summation.

And I think his only strategy based on this record, and your Honor actually knows this better than I do, but his only strategy seems to have been to combat all of the charges with respect to the undercover, not with expert testimony, because he couldn't do that, because clearly there was no legitimate medical purpose with respect to the undercover charges but rather to combat it based on the entrapment defense.

And the problem with that, and this is why I mentioned Lafler, the problem with that is that Mr. Liotti's understanding of the entrapment defense was legally wrong. He did not understand that the entrapment defense was going to open the door to BNE evidence that showed predisposition in the sense that it showed that -- well, it actually proved the government's case, I would argue, because the government's case was that this wasn't a doctor, this was a drug dealer.

And instead of having just a couple of isolated incidents that were contested at trial, Mr. Liotti's decision with respect to this entrapment defense which was facially meritless, there was no chance with this record, with this video surveillance, that showed that the undercover was really not trying to convince Dr. Belfiore to prescribe the drugs at all. It was pretty easy to get the prescription.

There's no reasonable way that a competent attorney could have got into that in the way that Mr. Liotti did, opening the door to this BNE evidence that showed that these isolated cases were not isolated, but in fact, were part of 6,000 prescriptions over the course of a three-year-period. 600 30 milligram pills of oxycodone, or more than that being prescribed over the course of less than a three-year period.

And on top of that, the fact that all of these prescriptions were creating or forming a larger, and larger percentage of Dr. Belfiore's medical practice even as the knowledge in the community of the harmful impact of oxycodone was growing.

And on that point, because it ties in, the other defense that was posited here with respect to Big Pharma was also devastating. It wasn't just a defense that was rejected by the jury, similarly to the entrapment defense, it was affirmatively harmful because the Big Pharma defense was actually used by the government affirmatively to destroy Dr. Belfiore's credibility when Dr. Belfiore went on the stand.

And the main resaon he was put on the stand was to play these videotapes from the 1990s and from 2000, showing that Big Pharma had or that Purdue Pharmaceuticals had a media campaign to show that

oxycodone was actually safe, and was not addictive.

The problem with that is that this so-called strategy two could not have been based on any research, any minimal amount of research or diligence in looking at the facts of this case. Not only would any amount of minimal research or diligence have revealed that, in fact, Purdue Pharma in 2007 which is years before the allegations of this case was held criminally responsible for its actions, but on top of that, and I think even more devastatingly, Mr. Liotti's central defense, he was arguing out of both sides of his mouth.

On the one hand, he was saying put Dr. Belfiore on the stand to testify that there was no way that he could have known that he had this legitimate medical purpose because he didn't believe that these drugs were addictive, he didn't believe that these drugs were harmful, he had been misled by Big Pharma in this regard, but at the same time, there were records that were put in evidence with which Dr. Belfiore was devastatingly attacked on cross-examination showing that in his practice, his own pain management contracts, specifically spelled out the fact that these drugs were addictive, and that they were dangerous in 2011, in 2012, in 2013, which were ten years after the videos that Mr. Liotti put into evidence, and which were at the time of the alleged

criminal charges.

Moreover, there was a video where the other undercover officer, I believe it was Undercover O'Toole (ph.), the female undercover officer, was being interviewed by, and Dr. Belfiore explicitly told her that these drugs are addictive, and that they're dangerous, and that she shouldn't take them.

So his central defense was confused. It was not based on a legitimate strategy which is what is required or a reasonable strategy, it was based frankly from my reading of the record, and I know that I wasn't here, and I'm probably at the greatest disadvantage in that regard, but from my reading of the record, it frankly seemed that Mr. Liotti had no idea what was in the pain management contracts. He had no idea that that was going to come out because when it did, there was simply no way to deal with them.

And they confused his central defense in a way that affirmatively destroyed Dr. Belfiore's credibility in front of this jury. So, you know, I don't want to -- I guess it's sort of ironic, they say with doctors, the first thing is do no harm. Well, with lawyers, I think that's true too. I think a criminal defense attorney, even when presented with a difficult case, has to in the first place, do not harm.

In this case, the defenses, the two central defenses, entrapment, and the Big Pharma defense were defenses that were based on a misunderstanding or a lack of knowledge of the law, a lack of knowledge of the operative facts, and that were not just rejected but that did harm, affirmatively did harm, to Dr. Belfiore and affirmatively helped the government prove the central elements of its case, which is that this was not an isolated incident, this was not a legitimate medical purpose because this was part of a drug operation.

Their quote that they stated repeatedly, I think I cited it in I don't know, twenty different ways in twenty different pages, was that this was not a doctor, this was a drug dealer.

And it was Mr. Liotti, who more than anything else, furnished proof of that through his choice of defenses.

THE COURT: All right. Thank you.

Go ahead, Mr. King.

MR. KING: Your Honor, just first with respect to Lafler, I think the Court has stated it accurately, is totally distinguishable for the reason that it wasn't just Mr. Liotti's opinion. His central argument here was that there was a legitimate medical purpose. He proffered expert testimony from Dr. Olsen (ph.) on that

point with respect to not only the decedents but also the undercover. Dr. Olsen testified that the prescriptions -- his review of the medical records established that it was legitimate to prescribe those drugs, that oxycodone to the undercover.

The other point here is that on the performance prong, when your Honor was making the point about the passage of time after the plea offer was conveyed, the inference to be drawn from that is that the defendant was not satisfied with the plea offer that had been conveyed. That is in fact what is set forth in Mr. Liotti's affirmation at paragraph 6. He says that Dr. Belfiore came to him after being dissatisfied with the pedestrian manner in which he was being represented by Marc Gann.

Ultimately, as the Second Circuit has repeatedly stated, the decision whether or not to plead guilty is the defendant's decision. Counsel has a duty to advise the defendant of the parameters of a plea offer, and also to consider the defendant's desire in this case, to put the government to its proof and to avoid collateral consequences which the record also shows that defense counsel investigated with civil counsel for the defendant over a course of at least several months after he was retained.

Ultimately, he concluded that although trial

would be difficult, the defendant's desire to retain his medical practice required that the defendant proceed to trial and that's what happened here.

It's also important to note that the defendant could not have allocuted to this because he repeatedly stated under oath in the media, that he did not do anything wrong, that he had not issued any prescriptions solely to make money, and not for a legitimate medical purpose. So he wouldn't have been able to allocute.

The other point to be made on that is that while defense counsel made a point that he could have allocuted because there have been diversion to his girlfriend that diversion related to the third visit, not to the sixth visit.

And also, the defendant's point with respect to the sixth visit was that this was the point at which he had become aware of what was going on, and he issued the prescription legitimately, with an effort to check through a pharmacist calling him as to whether or not his patient was complying with his instructions. So he wouldn't have been able to allocute under any count of the indictment.

THE COURT: Well, let me ask you one of their -- I guess their more basic argument is that the Court should have a hearing that this shouldn't be decided

based upon the papers and in terms of what the hearing would entail.

You know, certainly I know what Dr. Belfiore's position was based upon what his testimony was at the trial, but one of their arguments is is that -- basically that Mr. Liotti persuaded him, that he wanted to plead guilty, was ready to plead guilty, and that it was Mr. Liotti who persuaded him otherwise. And why isn't it at least -- the ability at least on that particular piece to develop the record from a more factual matter? All these other issues that are raised, obviously I sat through the trial. I can assess the performance of the attorney in terms of what they did, what defenses did or did not make sense. We don't need a hearing for that but on this issue of -- this would go to the prejudice prong, whether in fact, Dr. Belfiore was ready to take a plea, and it was only Mr. Liotti who talked him out of it, or whether or not as you're suggesting, he was already having cold feet, and was not prepared to plead guilty, was not prepared to lose his medical practice, and then found an attorney who was willing to sort of support that state of mind that he already had.

Why wouldn't we have a hearing on that where Dr. Belfiore could testify, maybe Mr. Gann could testify. I don't even know -- maybe the AUSA, was it Ms. Gatz? I

don't even know -- was it Ms. Gatz?

MR. KING: It was, your Honor.

MS. ALDEA: Yes.

THE COURT: Maybe Mr. Gann, you know, said things to her. I guess it would be hearsay but there was a long period of time where Mr. Gann was just telling -- first it was months between the complaint and the waiver. I don't know what was going on during that period of time in terms of negotiation or between Mr. Gann and Dr. Belfiore, and then there was this unusual many month postponement after the waiver of indictment. So why shouldn't that portion of the record be developed?

MR. KING: Your Honor, in this case there's no need to develop it because you do have the defendants own statements, both before the grand jury, at trial, and in the media, where he unequivocally states that he cannot plead guilty to something that he didn't do. And that is exactly what Mr. Liotti's stating in his papers when he is saying the defendant was dissatisfied.

The only performance that Mr. Gann had given to the defendant at this time was to extract the plea agreement. He couldn't allocute to it. That's why it took almost eleven months before he changed counsel and continued. He says this explicitly; I didn't do anything wrong. I can't plead guilty to something I didn't do.

It's in the record.

In contrast to other cases where there may be some question about what was in the defendant's mind, this is there. It's absolutely there, and there's no need to develop it further. Your Honor has the option of taking a middle road when you're presented with a record this explicit.

And in addition to that, I would just point out that in paragraph 7 of the defendant's affirmation, he doesn't say that Mr. Liotti guaranteed him that he would avoid conviction. He just gave him hope that he could avoid losing his medical practice. Hope is not a guarantee.

And Mr. Liotti's initial assessment that he wouldn't take the case unless the defendant had at least a thirty percent chance of acquittal is a minimal hope because that's saying you have a seventy percent chance of being convicted.

In addition to that, the record is showing that defense counsel with respect to what's required under the law did convey the parameters of the plea agreement to the defendant, did assess what the effect of taking a plea would mean, and certainly had in mind the defendant's desire to put the government to its proof, his maintaining of his innocence which is a factor he had

to consider as counsel. That's something he had to do. It's something the Second Circuit has made clear.

It's not simply that a plea offer appears beneficial. A defendant has to affirmatively decide whether to enter the plea. And here, based upon the defendant's contemporaneous statements, based upon the conduct that your Honor saw over many months where he is not accepting a plea offer that's been made in January, putting off appearances, allegedly to wind down his practice, it wouldn't have taken him very long, your Honor, to wind down his practice if he pleaded guilty because he wouldn't have been able to practice. That would have been the end of it.

So it rings hollow here. And in addition, you have very clear, unequivocal, under oath statements, statements in the media, he couldn't have pleaded guilty. So there was no prejudice here.

THE COURT: All right. Do you want to briefly respond?

MS. ALDEA: Yes, very briefly. The first thing is that with respect to the media, the grand jury, the statements at trial, I would note that all of those were made, all of them were made, after Mr. Liotti entered the case, and assumed the representation.

And so the fact that under his attorney's

advice, the client is making statements that are consistent with his attorney's views about whether or not he did something legally wrong, is hardly probative of anything.

Additionally, with respect to this question what the government just said, the AUSA just said that he didn't do anything wrong, that Mr. -- Dr. Belfiore had repeatedly said he didn't do anything wrong. This is precisely the difference between all of the case law on this, and this case.

The not doing anything wrong, wrong is a moral assessment, or in this case a legal assessment. Morally, Dr. Belfiore clearly did not believe that he did anything wrong. He did what he thought was right, what he thought he was permitted to do. And that's absolutely clear, your Honor, and that's absolutely true.

However, as lawyers, we know what is legally wrong, what legally constitutes a crime, and what Mr. Gann told him was that from a legal standpoint, what he did which was factually uncontested, in other words, the prescription of all these drugs was legally wrong because under the facts of this case, there would be no legitimate medical purpose.

What Mr. Liotti told him is that that was incorrect advice. That Gann should be sued for that

advice. That Gann should be fired for that advice. That that advice should be rejected, and that he should go to trial because he could do better, and that was objectively unreasonable based on this record, because again, this is a legal assessment and the attorney's advice, as to what is wrong under the law, is the advice that the client needs.

So when Dr. Belfiore later says I did nothing wrong in the media based on his lawyer's advice, that's accurate. That's accurate. But the underlying advice was wrong.

Again, it's like the defendant in Lafler saying I had no intent to kill because I shot under the waist. It doesn't matter from a legal standpoint.

THE COURT: Well, why wouldn't a middle-of-the-road approach at this point -- again, this is for purposes for fully developing the record --

MS. ALDEA: Yes.

THE COURT: -- the piece that I think is ambiguous is with regard to Mr. Gann and Dr. Belfiore, so why shouldn't I ask Mr. Gann, and I think the laws allows me to do this in my discretion, he's I think waived his attorney-client privilege for purposes of this motion, ask Mr. Gann to put in a declaration indicating that the substance of his discussions with Dr. Belfiore and how

that ended up, why shouldn't I have him do that?

MS. ALDEA: Your Honor, we don't oppose a full hearing on this issue. I think that in addition to just the --

THE COURT: Why should I have a full hearing -- if that's the piece that needs to be developed, maybe Mr. Gann puts in that declaration, Dr. Belfiore will read it and agree with it. Maybe everything that Mr. Gann says in that declaration, he'll say that's exactly the way it happened.

MS. ALDEA: That's possible.

THE COURT: So why should I have a hearing before I get that declaration?

MS. ALDEA: So, your Honor, I mean the first thing is, and I had already answered this, but from a legal standpoint, it's actually not required for the purposes of establishing prejudice, that the defendant was prepared at that moment, or definitively at that moment, had no doubts or no hesitations about taking a plea.

What is legally required, the legal standard is that there be a statement by the defendant which in this case there is, that had he been advised of the consequences, he would have entered a plea, which he did, and we have the record showing that he was prepared to

enter a plea.

But more than that, from a legal standpoint, the sentencing disparity and whether the attorney's advice, Mr. Liotti's advice was objectively reasonable or unreasonable, is what informs the inquiry under Strickland. So we've actually got it satisfied.

And with respect to when a hearing is required, a hearing obviously is required where there is a material question of fact that is going to be dispositive to the Court's determination of a motion, and where that material question of fact is based on two deferring or two contested statements of fact.

In this case, the key facts that are material are in Dr. Belfiore's affirmation. Mr. Liotti has submitted an affirmation in which he has not disputed any of that. He says in his affirmation, he never disputes that he told Dr. Belfiore that he could win this. He never disputes that he told Dr. Belfiore that he should fire Gann. He never disputes that he told Dr. Belfiore that he should go to trial.

And this issue that's raised by the government with respect to the medical license, and Dr. Belfiore potentially waiting because of the information on the medical license or being unwilling to give up his medical license, is really a red herring because the medical

license was going to be lost anyway.

If he went to trial, a reasonable attorney would have told him the medical license -- to the extent that that's lost upon a felony conviction, if you plead guilty you're going to lose the license but you have no mandatory minimum jail sentence.

If you don't plead guilty and go to trial, you're going to lose your license and you're going to be in jail for a mandatory minimum of twenty years to life. That's the difference.

THE COURT: All right. I --

MS. ALDEA: So your Honor can grant a hearing to directly answer your question. I'm sorry -- can grant a hearing to directly answer the question but I think that on this record based on the papers submitted, this motion actually can be resolved, and should be granted without one.

THE COURT: Well, again I don't agree with that because we have a record here where the doctor during the period he was before me, was definitely, you know, suggesting that he was innocent of this, and based upon what happened before me, did not appear to be in a position where he would be able to plead guilty.

What you're suggesting to me is that no, he was at a different mind set at a prior time. It was only

when Mr. Liotti came in that everything changed. So -- and you haven't proven that. As a matter of fact, as I pointed out, Dr. Belfiore doesn't even say that in his affidavit. He says hew as considering a plea.

So he doesn't even say I was -- and I understand you're talking about what's legally required or not, I will look at that once I know what the facts are. I don't even know what the facts are at this point. You can argue to me what is or what is not sufficient but we have like a black hole of information regarding why that delay took place. And rather than going immediately to a hearing, I don't know, you know -- that maybe completely unnecessary. I am not saying I won't grant the hearing but let's get Mr. Gann's affidavit. If Dr. Belfiore disputes what he says occurred in those conversations, what his mind set was, then if I deem it's going to be material to my decision, then we would have a hearing on that, at a minimum, if not on everything.

But I don't believe it's appropriate given we haven't even heard -- in all ineffective cases, you usually get a declaration before you go to a hearing, just so you can understand whether a hearing is necessary, and even if it isn't going to be necessary, what the scope of the hearing would be.

So I don't see any reason why not to get his

declaration, and then you can tell me whether Dr. Belfiore is disputing any part of it, okay?

But I don't want to do that just -- if I just issue an order to Mr. Gann, he may not completely understand.

MR. BARKET: If I may, your Honor?

THE COURT: Yes.

MR. BARKET: I mean, we -- maybe we all, but I certainly know Mr. Gann quite well, and I spoke to him about this, so we would be happy to provide an affirmation from Mr. Gann. It was -- it's somewhat of an awkward position for attorneys and Mr. Gann and I know Mr. Liotti for over thirty years. So we live and work in the same town almost literally.

So I don't want to make it sound terribly incestuous but I think your Honor understands. So I would be happy to go back to Mr. Gann. He knew that it was possible that he would either have to provide an affidavit or provide a -- testify in court about this. And I'm sure he would be willing to do it when I advise him about what the Court's position is.

THE COURT: Okay, Mr. King, that --

MR. KING: That's acceptable, your Honor.

THE COURT: All right. Again, I just want to emphasize to him, I think it's clear what the issues are

but that he obviously should recount what the reasons for the delay was, what Dr. Belfiore was telling him, about what his willingness or his unwillingness to plead at any particular time, independent of whether that would be dispositive, I want to know did Dr. Belfiore at any time express concerns about pleading guilty, and then very importantly, especially at the tail end of the relationship, what their discussions were about his intent to plead or not to plead.

MR. BARKET: I don't -- I mean one of the things I know from Mr. Gann is --

THE COURT: In other words, I don't want a one-sentence or --

MR. BARKET: No, no, no.

THE COURT: Not a one sentence but I want it to be --

MR. BARKET: We'll provide a detailed affidavit after his review of all the transcripts and everything that he would need to refresh his memory because this was several years ago.

THE COURT: And I don't know, do you know whether there was communications by email or not? Do you know whether Dr. Belfiore sent Mr. Gann emails or not?

MR. BARKET: I don't offhand, actually, now that you ask that question. I'm not sure. I haven't

seen any, so that's a --

THE COURT: Can you ask Mr. Gann that as well?

MR. BARKET: I will indeed. I think there are but I am not positive of that. I just don't recall seeing them.

THE COURT: Okay.

MR. BARKET: The other person that we may want to -- we don't have an affidavit from is Ms. Gatz, who I think that -- Mr. Gann and Ms. Gatz were discussing the case off the record during this time period.

THE COURT: Well, let's take it one step at a time. I mentioned Ms. Gatz too. She may have something relevant to say but she's secondhand. So whatever she will be testifying, I don't think she spoke to Dr. Belfiore directly, so it would be just what Mr. Gann told her.

So let's see what Mr. Gann says and whether or not there's any disagreement between your client, and Mr. Gann, and then if necessary, either at a hearing -- because if it's something material, and there's clearly a dispute, I may decide to have a hearing, and then Ms. Gatz could just testify at the hearing if it's necessary but let's just take it -- I don't think this will take too long, okay?

MR. BARKET: All right.

THE COURT: So talk to Mr. Gann. If you could just send a letter to me indicating when you think he'll be able to submit that by, I do want him on this question of any records of communications, I assume, you know, that the primary would be email but if he has any notes that relate to this particular issue, I would want them -- or emails of what Dr. Belfiore's state of mind was as to whether to plead guilty or not during this period, that they be attached to his declaration.

MR. BARKET: We'll do this as quickly as we can. March -- would March 20th be okay?

THE COURT: Sure.

MR. BARKET: That would be three full weeks.

THE COURT: Yep. And then what we would do is have another conference to discuss whether or not Dr. Belfiore agrees with what was in there, and then whether or not either further development of the record with a hearing or some other affidavit from Ms. Gatz or anything else, needs to -- we'll put it on -- if the 20th is the date, we'll put it on for like a week later. Okay?

MR. KING: Your Honor, just to expedite things, what we would ask, and I don't anticipate any issue with this is for when Mr. Gann is called, we would like to be on the call, so that we hear what is being conveyed to him about what is being asked of him by the Court. So

that if there's anything we think is particularly pertinent based on today's proceedings, that we would be ale to ask him to submit that as well.

THE COURT: Sounds reasonable.

MR. BARKET: I'm sorry, I --

THE COURT: They want to join in the call where you discuss with Mr. Gann what I am asking you to do. If you don't agree with that, I am going to bring him in. I'm going to tell him myself but --

MR. KING: We would just like to be on the call with --

THE COURT: They want to have a conference call --

MR. BARKET: I was literally going to -- I mean, I know him quite well. I was literally trying to text him now to see what his availability is, okay?

THE COURT: Okay. That's okay --

MR. BARKET: So --

THE COURT: When you are going to discuss with him the parameters of what you're asking him to do, again if you don't want to have Mr. King on the line for a reason you don't like that --

MR. BARKET: No, I don't mind it.

THE COURT: Okay.

MR. BARKET: But I mean I think there's part of

this that --

THE COURT: Yeah.

MR. BARKET: -- the initial, Marc, I need you to give us an affidavit.

THE COURT: That's fine.

MR. BARKET: I want to provide you this information.

THE COURT: And just tell him that there will be a conference call with the government and you, will discuss with him what I am requesting.

MR. KING: I wasn't referring to the preliminaries of setting it up. I just wanted to be available so that to the extent we had things we wanted him to submit or ensuring that whatever was submitted was in keeping with what occurred here today.

MR. BARKET: Sure. Yeah, I mean --

THE COURT: All right.

MR. BARKET: -- I don't think there's any rule about preventing them from reaching out to Mr. Gann themselves.

THE COURT: No, no, I was going to suggest that you just have him come in here and I would tell him directly but I trust both of you to be able to convey what I said. So I'm okay with that. Okay?

MR. KING: Your Honor, we did have one final

point that we wanted to bring out about our papers. It doesn't relate to anything we said today, that's why I just wanted to close with it very briefly.

THE COURT: Okay.

MR. KING: This is on the question of the jury instruction. I just wanted to point out, it's not in our papers but your Honor's jury instruction concerning the but for cause of death is consistent with what is in Judge Sand's Modern Federal Jury Instructions. That was the charge that we asked for months before it was given. And in addition to that, Judge Sand points out in his commentary that the reason there is a line in there about proximate cause not being required is because every Court of Appeals have considered the issues has determined that proximate cause is not required.

THE COURT: Yes.

MR. KING: So I just want to make sure that we cover that before concluding today.

THE COURT: Okay. All right. So we'll put it on for like the 27th or 28th of March?

MR. BARKET: We won't need anymore than a week after the submission.

THE COURT: Yes.

MR. BARKET: We'll have the (indiscernible) or not -- we'll have the -- sorry. We don't need anymore

than a week after the submission to get Dr. Belfiore's position becuase obviously we'll have the affidavit in hand --

THE COURT: Well, yeah.

MR. BARKET: -- quickly.

THE COURT: 28th? How about march 28th at 2:30?

MR. BARKET: That's fine. Is it okay with you?

MS. ALDEA: Yes, that's fine.

MR. KING: It works for the government, your Honor.

THE COURT: All right. And if there's any disputes or questions about the scope of the affidavit, just write me a letter, and if necessary, we'll have a conference before the 20th, okay? All right. Thank you very much. Have a good day.

MR. KING: Thank you, your Honor.

MR. BARKET: Thank you, Judge.

MS. ALDEA: Thank you.

(Matter concluded)

-o0o-

**C E R T I F I C A T E**

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **2nd** day of **July**, 2019.

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.