FILED
CLERK

7/9/2019 8:48 am

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------X  Docket#
UNITED STATES OF AMERICA,      : 15-cr-00242-JFB
                               :
        - versus -             : U.S. Courthouse
                               : Central Islip, New York
                               :
MICHAEL BELFIORE,              : July 8, 2019
              Defendant        : 10:28 AM
------------------------------X
```

TRANSCRIPT OF CRIMINAL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Government**:          **Richard P. Donoghue, Esq.**
                                United States Attorney

                           BY:  **Bradley King, Esq.**
                                **Charles N. Rose, Esq.**
                                Assistant U.S. Attorney
                                610 Federal Plaza
                                Central Islip, NY 11722

**For the Defendant**:          **Donna Aldea, Esq.**
                                **Bruce A. Barket, Esq.**
                                Barket Marion Epstein
                                & Kearon LLP
                                666 Old Country Road
                                Suite 700
                                Garden City, NY 11530


**Transcription Service**:      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                laferrara44@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Calling case 15-cr-242, United

2   States of America v. Belfiore.

3          Counsels, please state your appearances for the

4   record.

5          MR. KING:  Good morning, your Honor.

6          Bradley King and Charlie Rose on behalf of the

7   United States.

8          THE COURT:  Good morning.

9          MR. ROSE:  Good morning, your Honor.

10          MR. BARKET:  Good morning, your Honor.

11          Bruce Barket and Donna Aldea for Dr. Belfiore.

12          THE COURT:  Good morning.  And Dr. Belfiore is

13   present as well.  You can all remain seated because we

14   don't have the court reporter.  We're using a recording

15   device and during the hearing, I would just try to

16   remember that you need to be at the podium so that the

17   mic can pick up your voice.

18          As you know, I scheduled this for an

19   evidentiary hearing.  I just want to make sure, I think

20   everybody understands what the scope of the hearing is

21   but I just want to reiterate it.

22          As has been previously discussed, the issue for

23   purposes of the hearing, at least at this juncture, is

24   limited to whether or not Dr. Belfiore received

25   ineffective assistance of counsel with respect to his

3

Proceedings

1  plea negotiations with the government, and the offer that
2  was made, and the advice that he received in connection
3  with that offer.  And in connection with that, if he did
4  receive ineffective assistance in connection with that
5  advice, would he have pled guilty if he had received
6  effective advice in connection with that.
7          So those -- that's my understanding of what we
8  are having the hearing about but if anyone differs on
9  that, I am happy to discuss it.  And both sides agree
10 that that -- and understand that that's the scope of this
11 hearing?
12         MR. KING:  Yes.
13         MS. ALDEA:  Yes, your Honor.
14         THE COURT:  All right.  So why don't you tell
15 me how you intend to proceed then, Mr. Barket?
16         MR. BARKET:  Sure.  We're going to call --
17         THE COURT:  Stay seated.  I know it's habit.
18         MR. BARKET:  Oh.  And then the next judge I
19 appear in front of me is going to scold me for staying
20 seated.
21         We're going to call two witnesses, Marc Gann,
22 and Dr. Belfiore.
23         THE COURT:  Okay.
24         MR. BARKET:  May I proceed?
25         THE COURT:  Which order do you want to go in?

Gann - Direct - Barket                                    4

1           MR. BARKET:  I think Mr. Gann would prefer to

2    go first.

3           THE COURT:  Okay.

4           MR. BARKET:  So we'll accommodate him.

5           THE COURT:  All right.  Mr. Gann, you can come

6    up.

7    M A R C   G A N N ,

8       called as a witness, having been first duly sworn,

9       was examined and testified as follows:

10          THE CLERK:  Please be seated and state your

11   name and spell it for the record.

12          THE COURT:  Just pull that mic all the way

13   over.

14          THE WITNESS:  Marc Gann, M-A-R-C, G-A-N-N.

15          THE COURT:  Good morning, Mr. Gann.

16          THE WITNESS:  Good morning, your Honor.

17          THE COURT:  Okay.  Go ahead, Mr. Barket.

18          MR. BARKET:  Thank you.

19   DIRECT EXAMINATION

20   BY MR. BARKET:

21   Q    Good morning.

22   A    Good morning.

23   Q    How long have you been admitted to practice law?

24   A    34 years.

25   Q    And how long have you been admitted to practice in

1  the federal courts?

2  A    Almost that amount of time, I would say.

3  Q    In the course of your career, let me just ask, how

4  did you begin your career?

5  A    I began as a prosecutor in the Nassau County District

6  Attorney's Office.

7  Q    And how long were you there for?

8  A    Three years.

9  Q    And since then, what kind of work have you done?

10  A    Predominantly criminal defense work.

11  Q    In state court?

12  A    State and federal court.

13  Q    Do you know how many cases you've handled in the

14  federal courts?

15  A    I don't.  I would say over 100.

16  Q    And did there come a point in time where you were

17  retained to represent Dr. Michael Belfiore?

18  A    I was.

19  Q    And what kind of case did he come to with?

20  A    He was being charged -- was investigated for, and

21  being charged with the illegal distribution of narcotics

22  in the course of his practice as a medical doctor.

23  Q    And what context?  Was he selling drugs in the street

24  or --

25  A    No, the allegations were that he was issuing

Gann - Direct - Barket                                        6

1  prescriptions to patients without conducting proper

2  medical tests, diagnoses, and following proper protocol.

3  Q    And did you receive discovery and evidence in the

4  course of your --

5  A    I did.

6  Q    -- representation -- sorry.

7       What did you receive, if you recall?

8  A    I received various written discovery but the one

9  certain piece that sticks out in my mind was there was a

10 videotape of various interactions between Dr. Belfiore,

11 and what came to be known as an undercover officer or

12 agent, who went into his practice for purposes of trying

13 to determine what Dr. Belfiore was doing with the

14 medications.

15      I should also say that we had at least one, if not

16 more, meetings in the form of kind of a reverse proffer,

17 although Dr. Belfiore wasn't present, I was and certainly

18 an associate in my office was, where we met with the

19 United States Attorney and the agents and went over the

20 evidence that they had, and discussed general terms under

21 which a plea might be negotiated.

22 Q    Okay.  Let me just define, I think we all know but

23 just for the record, define a few things that you talked

24 about.  When you say "reverse proffer", what do you mean

25 by that?

Gann - Direct - Barket                                    7

A      At the time it was AUSA Gatz, and she offered to sit

down with me, and discuss with me the strength of the

case that the government had against Dr. Belfiore, and to

lay out some of that information, you know, from the

perspective of trying to work out a plea.

Q      And you mentioned an undercover officer going into

his practice.  Could you describe in more detail what

that entailed?

A      Well, it entailed an undercover officer, I guess,

posing as a potential patient, and making an appointment

with Dr. Belfiore, and going in for examination, and

treatment, and prescriptions over a period of a couple of

months, I think it was, but I think there were six or

seven visits to Dr. Belfiore.

Q      Was he, that undercover officer, was he seeking

medication?

A      Certainly seemed to be, yes.

Q      The very medication that the doctor ended up being

charged with distributing illegally?

A      Correct.

Q      And did the doctor on the videotape agree to

prescribe the medications?

A      He did.

Q      In addition to reviewing that yourself, did you

consult with any medical experts?

1  A    I did.

2  Q    And --

3  A    We retained an expert.  I don't remember the expert's

4  name as I speak, but I believe he was the chief of pain

5  management at Weill Cornell Hospital.  We retained him to

6  review the records that were provided with regard to the

7  "patient", the undercover officer, and to review the tape

8  that was made of the visits that that officer had with

9  Dr. Belfiore.

10 Q    Okay.  In the course of your review of the evidence,

11 did you determine whether or not there were any medical

12 tests performed on this patient to justify the treatment

13 or justify the prescriptions?

14 A    Well, I don't know that I made that determination.  I

15 can tell you that I know of no medical tests that were

16 done on the patient but I also know that in my

17 conversations with the expert that we retained, that he

18 indicated that there were a significant number of

19 problems with the manner in which Dr. Belfiore was

20 treating this patient, and one of his concerns was he

21 didn't believe that there was any testing that had been

22 done, and that it should have been done.

23 Q    Okay.  How long did you represent Dr. Belfiore?

24 A    I think it was roughly a year-and-a-half, something

25 like that.

Gann - Direct - Barket                                              9

Q    And what was your relationship like with him?

A    I had -- I thought I had a very good relationship
with him.  I met with him on a number of occasions.  I
went to his office and met with him.  He came to my
office and met with me on many occasions.  I was very
interactive with his staff, particularly his office
manager at the time, family.  We had a number of meetings
with the family, and anybody that Dr. Belfiore wanted to
be present for the conversations that we were having
about a resolution and certainly what I viewed to be in
his best interest.

Q    Did there come a point in time where the government
offered him a plea?

A    Yes.

Q    Could you describe generally what that entailed?

A    Yes.  And the reason that I thought it was so
favorable was that the plea was going to be limited to a
plea to the distribution counts that related specifically
to the undercover officer or agent.

     There were -- in the course of our discussions about
the case, there were clear indications that -- and it was
-- information was provided to me that at least two,
maybe three of Dr. Belfiore's patients had died and it
was -- the government believed that that was directly
related to the prescribing pratcices that Dr. Belfiore

Gann - Direct - Barket                               10

1   was engaging in.

2        In the course of our convesations and negotiations

3   towards a resolution, the government indicated to me that

4   they were willing to offer him a plea to the counts that

5   related specifically to the undercover agent and to

6   exclude even from relevant conduct, any information or

7   allegations related to the deaths that had occurred, and

8   that they believe were attributable to his prescribing

9   practices.

10  Q    Okay, and did --

11  A    And so his guideline -- I believe the guideline range

12  that we were talking about, was something in the

13  neighborhood of either 24 to 30 months or 27 to 33

14  months, it was something in that range.

15  Q    And did you make a recommendation --

16        MR. BARKET:  Withdrawn.

17  Q    Did you form an opinion as to whether or not the case

18  was defensible as it related to the count they're asking

19  Dr. Belfiore to plead to?

20  A    I felt that it was completely indefensible.

21  Q    Why is that?

22  A    Because we didn't -- first of all, based on what I

23  saw on the tapes, which some of the language, some of the

24  statements that were made by the purported patient, were

25  to me as a laymen, red flags for problems.

Gann - Direct - Barket                              11

1       Also, in the course of the meetings that we had with

2  the government, and the agent on the case, I was also

3  advice that the agent had or the agents had gone to Dr.

4  Belfiore's practice approximately a year before any

5  charges were filed against him to warn him about his

6  prescribing practices, and to advise him that there were

7  individuals that were dealing drugs in his parking lot,

8  that appeared to be, you know, related to the

9  prescriptions that he was writing for him.  That they --

10 that he had hired security -- that he had to hire

11 security for his waiting room because patients who

12 appeared to be significant drug addicts were getting into

13 arguments, and it was getting physical at times in his

14 office.

15      And because in reviewing the videos also, it was

16 clear to me that he wasn't following through with the

17 testing that he was initially asking the patient to

18 engage in, and continued to prescribe irrespective of the

19 fact that the patient wasn't following through with the

20 testing that Dr. Belfiore indicated he needed to follow

21 through with.

22      Those were at least some of the things that the

23 expert that we retained pointed out in my conversations

24 with him that were significant problems, and that he

25 would not -- and didn't think that any -- I won't -- I

Gann - Direct - Barket                                    12

1    will use the word I don't think he did, any self-
2    respecting expert would testify that the manner in which
3    Dr. Belfiore was prescribing to this patient could be
4    justified.
5    Q    In addition to the things that you described, do you
6    recall in the videotape, the patient or the undercover
7    officer stating that he was providing some of this
8    medication to his girlfriend.
9    A    Yes.
10   Q    Was that another factor that you considered?
11   A    It was.  That was one of the, you know -- even as a
12   layman, one of the red flags to me that was problematic,
13   even without having an expert involved, but I thought it
14   prudent to have an expert review the records and the
15   video to get that perspective, as well.
16   Q    After forming your opinion, did you make a
17   recommendation to your client as to what he should do?
18   A    I did.
19   Q    What did you tell him?
20   A    I told him that I thought he should take a plea.
21   That I didn't think there was any way that this case
22   could be tried, and tried successfully.  And that I felt
23   that even though we were dealing with -- we had a
24   discussion about the guidelines, and the way the
25   guidelines work, and you know the kinds of things that

Gann - Direct - Barket                    13

1    might of assistance in terms of downward departures or

2    3553 factors, that could be of assistance once he took a

3    plea, to address whether and how much time he would

4    ultimately get.

5    Q    Did he take any steps concrete steps towards taking a

6    plea?

7    A    I believe that he did.  It was my belief that that's

8    what he was doing at the time.  I had referred him to an

9    attorney by the name of Caroline Wolf, who was a partner

10   at Abrams Fensterman, who did -- her area of practice was

11   in representing medical professionals in both

12   disciplinary act proceedings, and in the partner shifts,

13   and the sale and/or expansion of their practices, and

14   then I dealt with one of her either associates or

15   partners there, Jordan Fensterman, who I think was

16   actually handling the matter.  We, at various times,

17   discussed issues with regard to Dr. Belfiore's license.

18   We discussed the manner in which taking a plea might or

19   would affect that license.

20        There were also discussions, and I verified those

21   discussions, not only with Abrams Fensterman, but with

22   the individual doctor herself, there were discussions

23   going on with that doctor about purchasing Dr. Belfiore's

24   practice, as I understood it.

25   Q    Who was the doctor, by the way, that was going to

Gann - Direct - Barket                                      14

1   purchase it?

2   A    I believe her name was Dr. Navid.  I think she was in

3   Hicksville.

4   Q    Did there come a point in time where you were sub --

5   or you were essentially fired as his attorney with

6   another attorney taking over for you?

7   A    Yes.

8   Q    Who was the attorney who took over for you?

9   A    Thomas Liotti.

10  Q    How did you find out about this?

11  A    I received a -- I believe it was a fax, delivered to

12  my office actually on a day that Ms. Gatz and I were

13  talking about scheduling issues for -- potentially for

14  Dr. Belfiore's plea.  I received a fax indicating that I

15  was being substituted, and Mr. Liotti was taking over.

16  Q    I want to direct your attention to a few days before

17  that.  Did you have a meeting with Dr. Belfiore?

18  A    Yes, I believe so -- I know I did.  I can't tell you

19  exactly what day that was but, yes.

20  Q    How close in time or how much before the fax from Mr.

21  Liotti was this meeting?

22  A    I would say within a week roughly.  I don't think it

23  was anymore than a week.

24  Q    Okay.  Who was at the meeting, as best you can

25  recall?

1  A    I remember Dr. Belfiore being there.  I remember his

2  wife being there.  I remember an attorney who was a

3  friend of his, I can't remember his last name, his first

4  name also was Jordan.

5  Q    Jordan Glass?

6  A    Jordan Glass, yeah.  His office manager, Debbie --

7  Q    Ms. Scampoli (ph.) -- Scampoli?

8  A    I believe so, yes.  I know they were there.  His

9  father-in-law may have been there.  I know his father-in-

10 law was present at times when I did have meetings with

11 them.  He had a relative who is an attorney, that was

12 also present at various meetings with Dr. Belfiore.  I

13 don't know that he was there at that meeting, but at

14 various conversations that we had had.

15 Q    And did you have discussions about whether or not Dr.

16 Belfiore was going to take a plea?

17 A    We had discussions that I felt were clearly leading

18 towards Dr. Belfiore taking a plea.

19 Q    What do you mean by that?

20 A    Well, so in that meeting in particular, it was my --

21 you know, I think I was pretty aggressive about

22 indicating to him that we cannot delay this any further.

23 That if we continued to delay this process, regardless of

24 whether he's sold his business or not, that the plea

25 offer essentially that is being made is going to be

Gann - Direct - Barket                              16

1   revoked, and we're going to be in a position where we're

2   going to have to try the case.

3       And so it was time to make the decision to take a

4   plea.  And the vast majority of people that were present

5   at that meeting, were in agreement that it was in his

6   best interest to take a plea, and that he should take a

7   plea.

8       I believe the only person that expressed any

9   reservation about it was his wife, who was expressing

10  concern about his medical practice, and his ability to

11  earn a living and support the family if he took a plea.

12  Q    Well, what was Dr. Belfiore's reaction?

13  A    He seemed to be of the mind that it -- yes, it was

14  time to take the plea.  All the discussions that we had

15  leading up to that meeting that I had had with him

16  indicated to me that he was -- that he wanted to take

17  this plea, and wanted to be done with this.  And

18  recognized the value of taking the plea.

19      I don't recall what he said at that meeting.  I don't

20  -- I don't recall exactly what his participation was.  I

21  mean, I know he was there, and I know he was part of the

22  conversation but, you know, everybody that was there

23  other than his wife was pushing him to get this over with

24  and to get it done.

25  Q    And was he in agreement or did he voice objection to

1  it?

2  A    He certainly didn't voice objection to it.  The

3  hiring of another lawyer came as a complete shock to me.

4  It was completely out of the blue.

5      I expected frankly, that we were -- at our next court

6  appearance, we were going to be entering a plea but I

7  can't say that he ever, you know, said to me I'm taking

8  the plea --

9  Q    Are --

10  A    -- but I had that clear impression.

11  Q    He didn't use those words but you were left the

12  impression that he was going to?

13  A    Yes.

14  Q    And that was based upon what?

15  A    That was based upon the number of conversations that

16  we had had over time including that meeting, based on the

17  patients that the government and the Court had shown in

18  allowing us to continue to try and finalize the details

19  of the sale of his practice because that was something

20  that was important to him, and presumably to his wife, to

21  have that done before a plea was entered.

22      And based on the conversations and the advice that he

23  appeared to be getting from virtually everybody else in

24  his life, at least that I had contact with.

25  Q    And he was not -- do you recall him objecting to it,

Gann - Cross - King                                          18

1    and insisting to going to trial?

2    A    No, and every time we appeared in court, you know, we

3    were -- and he knew that I was representing to the Court,

4    and to the United States Attorney's Office that, you

5    know, we were trying to finalize some logistical details

6    before entering into a plea.

7    Q    And he didn't raise objection after the court

8    appearances, saying what are you saying, I am taking a

9    plea, I want to go to trial or anything of the sort?

10   A    No.

11              MR. BARKET:  One second, your Honor, please.

12              THE COURT:  Okay.

13              MR. BARKET:  Thank you.  That's all I have.

14              THE COURT:  Okay.  Cross-examination?

15              MR. KING:  Thank you, your Honor.

16   CROSS-EXAMINATION

17   BY MR. KING:

18   Q    Good morning, Mr. Gann.

19   A    Good morning.

20   Q    Sir, you've been practicing as a prosecutor and

21   defense attorney for about 34 years, right?

22   A    Yes.

23   Q    And during that time, is it fair to say that you've

24   been involved on the state and federal level, thousands

25   of guilty pleas?

Gann - Cross - King                                    19

1   A     Yes.

2   Q     And is it your practice not to schedule a guilty plea

3   as a defense attorney unless the client actually tells

4   you that they are prepared to plead guilty?

5   A     I would say that I would in federal court in

6   particular, I would advise the government in advance that

7   my client was ready to take the plea, and we would have

8   finalized the documents that would be necessary for that

9   purpose.

10  Q     And that communication to the government would be

11  based on an affirmative communication from your client,

12  correct?

13  A     I would say so.

14  Q     And that's because ultimately, it's a client's

15  decision whether or not to plead guilty, right?

16  A     Yes.

17  Q     Now in this case, the government sent you a plea

18  agreement around January 7th, 2015, correct?

19  A     That sounds about right.

20  Q     Okay.  And you discussed that plea agreement with the

21  defendant, right?

22  A     I did.

23  Q     And you discussed that plea agreement with him

24  repeatedly, correct?

25  A     I did.

Gann - Cross - King                              20

1  Q    And in this case, the defendant never affirmatively
2  told you that he was prepared to accept that plea
3  agreement, right?
4  A    I can't say that he used those words.  You know, I
5  can tell you that his actions led me to believe that
6  that's where we were going, and had it been otherwise, I
7  wouldn't have made the representations that I was making
8  to the government about where we were.
9  Q    But those representations were always that a plea
10 agreement was possible, not that it was finalized,
11 correct?
12 A    I -- I can't say -- I certainly can't say that we had
13 a date to -- where I indicated he was actually going to
14 take the plea.
15 Q    And the defendant never signed the plea agreement,
16 correct?
17 A    Correct.
18 Q    And you testified just previously that you'd had a
19 meeting with the defendant and his family members, and
20 other people, and that was around October 23rd of 2015?
21 A    Roughly.
22 Q    Okay.  And at the meeting, the defendant's wife
23 expressed some concern about his taking the guilty plea;
24 is that right?
25 A    Yes.

Gann - Cross - King                    21

1  Q    And her concern was that if the defendant pleaded

2  guilty, he would lose his medical practice, right?

3  A    She had serious concerns about that, yes.

4  Q    Okay.  And at the meeting, I apologize in the advance

5  for using the profanity, but I want to be clear and I

6  think there's a basis for using it, did you tell the

7  defendant in substance that he needed to "shit or get off

8  the pot?"

9  A    I don't know that I used those words.  I may have

10 used them in a conversation with you leading up to this

11 hearing but I certainly was aggressive in indicating that

12 I did not think this was a triable case.  That we had

13 been -- that the plea agreement had been in our hands for

14 roughly nine months at that point, and that we could not

15 wait any longer before taking the plea.

16      In fact, I think Judge Seybert who was the judge at

17 the time, had indicated to us that if we did not enter

18 into a plea agreement by that either October or early

19 November status conference that we would be trying the

20 case in December.

21      And so I was definitely very strong in my opinion as

22 to what I thought he should do, and that the time had

23 come to make that decision, and finalize this case,

24 regardless of what the sale -- the logistics of the sale

25 of his practice were.

Gann - Cross - King                                    22

1   Q    So the bottom line was you were being emphatic
2   because you wanted a final decision, correct?
3   A    I wanted a final resolution to this case which
4   involved him stating I'm ready to take this plea.
5   Q    And you never got that resolution, right?
6   A    I didn't.  I got substituted before I thought that
7   was going to happen.
8   Q    And as a result, you were never able to schedule a
9   plea?
10  A    Correct.
11  Q    You submitted a -- just one moment.
12       Mr. Gann, before you came to testify today, you
13  submitted an affidavit in connection with the defendant's
14  motion to vacate his conviction, correct?
15  A    I did.
16  Q    And that you submitted that around March 26th of 2016
17  -- March 26th of 2019, correct?
18  A    That sounds about right.
19  Q    And in essence, nothing in that affidavit states that
20  the defendant ever affirmatively told you that he was
21  prepared to plead guilty, right?
22  A    I believe that's correct, but I would need to see it
23  again now but I believe that's correct.
24  Q    Could I -- would you like me to show you a copy of
25  it?

Gann - Cross - King                                    23

1   A    Sure.  I am happy to take a look.

2   Q    Okay.

3           MR. KING:  Your Honor, can I approach with a

4   copy of the affidavit?

5           THE COURT:  Sure.

6   A    That's correct.

7   Q    Thank you.

8           MR. KING:  I'm going to -- Judge, can I just

9   approach and take that back?

10          THE COURT:  Sure.

11          MR. KING:  Thank you.

12  Q    Mr. Gann, when you were just testifying a moment ago,

13  you talked about various information that you got during

14  your representation of the defendant.  You discussed a

15  reverse proffer that you had with AUSA Gatz?

16  A    Yes.

17  Q    Is that right?  And you talked about information that

18  you got about drug-addicted patients swarming the

19  defendant's office?

20  A    Yes.

21  Q    And creating security concerns?

22  A    Yes.

23  Q    And you talked about the DEA issuing the defendant a

24  warning to cease his oxycodone-prescribing practices.

25  A    Yes.

Gann - Cross - King                    24

1   Q    And you talked about information that you got about

2   patients dying as a result of the defendant's oxycodone

3   prescribing practices, right?

4   A    Yes.

5   Q    And you also talked about the fact that you had

6   engaged an expert who, in essence, told you that with

7   respect to the undercover videos, the case was

8   essentially indefensible, right?

9   A    Correct.

10  Q    Did you share all that -- you shared all that

11  information with the defendant, correct?

12  A    I did.

13  Q    And nevertheless, at no time did the defendant tell

14  you that he was affirmatively prepared to plead guilty,

15  right?

16  A    I don't believe he used those words.

17  Q    He never said schedule the guilty plea, right?

18  A    That's -- that's correct.  He never used those words.

19  Anything -- any impression that I had that he was ready

20  to take a plea was from just my impression of those

21  conversations, not from the specific words that he used.

22  Q    And ultimately, as a result of your interactions with

23  him, the defendant, no guilty plea was ever scheduled,

24  correct?

25  A    That's a fact.

Gann - Cross - King                                    25

1              MR. KING:  No further questions, your Honor.

2              THE COURT:  Before any redirect, I just have a

3      couple of questions, Mr. Gann.

4              THE WITNESS:  Yes, Judge.

5              THE COURT:  I guess to the extent you can

6      explain to me a little bit more about how this issue

7      regarding the sale of the practice related to his

8      decision to plead guilty or not, I guess was the

9      discussion he wasn't going to plead guilty unless he sold

10     the practice, until he sold the practice?  Because it's

11     not clear to me -- obviously, you know, some things are

12     more tied into a guilty plea like what the government is

13     offering, this was like a collateral issue, and he wasn't

14     going to be remanded or anything at the time of the plea.

15     So I guess I don't understand how that piece played into

16     the discussions.

17             THE WITNESS:  My --

18             THE COURT:  Let me just add another thing that

19     you may want to cover separately.  I think you mentioned

20     during your direct about his license.  So was there a

21     separate discussion about -- apart from his practice,

22     which obviously would have to stop because of his jail

23     time, but was there a discussion about his ongoing

24     ability to practice after he got out in terms of his

25     license?

Gann - Cross - King                                    26

1            THE WITNESS:  We had -- I will take the second

2       one first, Judge.

3            THE COURT:  Okay.

4            THE WITNESS:  We did have discussions about his

5       medical license, and we had those early on, which is part

6       of the reason that I had referred him to Carolyn Wolf at

7       Abrams Fensterman, to deal with those potential

8       disciplinary issues, and get an opinion from her on what

9       the effect that would have on his license was.

10            I certainly indicated to him in my

11       conversations with him that it was my expectation that

12       the guilty plea was going to result in OPMC yanking his

13       license.  He had already given up at the time of his

14       initial arraignment, he had given up his right to write

15       narcotics prescriptions but I did feel that upon a guilty

16       plea, that they would probably come in and take his

17       medical license from him.

18            But I left those detailed conversations for him

19       and the Abrams Fensterman people to have and to try and

20       sort out if they did that.

21            So that was part of a collateral conversation

22       that we had about taking a plea.

23            THE COURT:  But I guess was that a -- in your

24       conversations with him, was that or him and his family

25       and friends, was that a sticking point or an issue,

1  whether or not -- I mean I think it was clear that he was

2  going to have his license revoked for some period of

3  time, but his ability to practice after he got out, was

4  that an ongoing discussion, and issue, what was going to

5  happen when he got out of jail?  Was he going to be able

6  to be a doctor when he got out of jail --

7              THE WITNESS:  Um.

8              THE COURT:  -- or it didn't get to that level?

9              THE WITNESS:  I don't think -- I don't think

10 with him that it really got to that level.  That was -- I

11 don't think the licensing issue was a problem for him.

12 It -- his wife seemed to be the one that in various

13 communications seemed to have the biggest issue with

14 that.  He didn't seem to have that issue with whether or

15 not he was going to be able to practice medicine once

16 this case was fully resolved, and if there was jail,

17 whatever jail time he served.

18              What the -- as far as the sale of the practice

19 was concerned, the reason that that came into the

20 conversations was because he viewed the value of the

21 practice to be substantially diminished once he took a

22 plea.  So if the logistics of that could be worked out

23 before he took a plea, my understanding was that he

24 viewed -- that he would be able to sell the practice at

25 something less than a fire sale, so-to-speak, and so that

1    had some value to him in the course of the conversations

2    that we were having because with any client, it's not

3    just about, you know, the whether you're going to win or

4    lose the case, and the ramifications of that but

5    particularly dealing with a professional, there are the

6    collateral consequences that are part of the conversation

7    but I will say that by the time we got to that October

8    meeting, my point to him was these collateral

9    consequences don't matter anymore.  It's not -- we're not

10   in a position to be concerned with them any further, you

11   know.  We're talking now about jail and how much jail,

12   and whether this -- you can be -- you know, how much can

13   be saved here.

14          THE COURT:  Okay.  My last question, and I

15   don't know whether you ever got to this discussion with

16   him about what he would have to say in front of Judge

17   Seybert in order to plead guilty, did you ever have a

18   discussion with him that you're going to have to admit X,

19   Y and Z, or you never got to that point?

20          THE WITNESS:  I believe we did.  I believe we

21   did -- we had that conversation on more than one occasion

22   frankly because in talking about the plea, I -- you know,

23   I told him that he's going to have to admit that he, you

24   know, sold narcotics without having a proper medical

25   purpose for doing so.

Gann - Cross - King                                    29

1          I know you're going to ask me what his response

2    to that was.

3          THE COURT:  That's my question.

4          THE WITNESS:  And I don't know that he -- other

5    than an okay, I don't know that there was ever anything

6    more than that as a response.  You know, or -- and I

7    understand.  That -- it was something along those lines

8    that was conveyed to me.  I can't go as far as to say

9    that he said I'm prepared to say that but there was

10   certainly an understanding that that would be required of

11   him if he were going to take a plea in the case.

12         THE COURT:  Okay, thank you.

13         All right.  Is there any redirect?

14         MR. BARKET:  No, thank you, your Honor.

15         THE COURT:  Does the government have anything

16   further based upon my questions?

17         MR. KING:  No, your Honor.

18         THE COURT:  All right.  Thank you, Mr. Gann.

19         THE WITNESS:  Thank you.

20         THE COURT:  Keep going?  You don't need a

21   break, right?

22         MR. BARKET:  No.

23         THE COURT:  You're good.

24         MR. BARKET:  I'm good.

25         THE COURT:  Okay.

Belfiore - Direct - Barket                    30

1          MR. BARKET:  Dr. Belfiore, please.

2          THE COURT:  Dr. Belfiore, if you could please

3   take the stand.

4   M I C H A E L   B E L F I O R E ,

5       called as a witness, having been first duly sworn,

6       was examined and testified as follows:

7          THE CLERK:  Please have a seat and spell your

8   name for the record.

9          THE DEFENDANT:  Michael Belfiore, M-I-C-H-A-E-L

10  B-E-L-F-I-O-R-E.

11         THE COURT:  Just I don't know whether the

12  microphone is able to pick up, just to be clear on the

13  oath that Dr. Belfiore answered yes to the oath.  I don't

14  know if the mic picked it up.

15         All right, go ahead.

16  DIRECT EXAMINATION

17  BY MR. BARKET:

18  Q    Good morning, Doctor.

19  A    Good morning.

20  Q    How long have you been licensed to practice medicine?

21  A    25 years.

22  Q    Okay.  I think there's a good record of your history,

23  and your background from the course of the trial.

24         MR. BARKET:  So I am going to kind of skip over

25  that, if that's okay with the Court.

Belfiore - Direct - Barket                          31

1              THE COURT:  Yes.

2              MR. BARKET:  And the government?

3              THE COURT:  Yes.

4    Q    I want to the charges, and the -- and your arrest,

5    and so forth.  There came a point in time where you were

6    indicted and arrested, is that right?

7    A    Yes.

8    Q    And you ended up retaining an attorney to represent

9    you?

10   A    Yes.

11   Q    What attorney was Mr. Gann?

12   A    Yes.  Yes, sir.

13   Q    With respect to Mr. Gann, how did you learn of him or

14   how did you find him?

15   A    Mr. Gann was referred to me.

16   Q    By who?

17   A    By a friend who is an attorney, and a relative who is

18   an attorney.

19   Q    And in the course of looking for an attorney after

20   your arrest, did you conduct interviews with other

21   lawyers?

22   A    Yes.

23   Q    How may, if you recall?

24   A    Approximately five or six.

25   Q    And can you list some of those for the Court?

Belfiore - Direct - Barket                    32

1   A     Let me see, there was a Ms. Kelp (ph.), there was a

2   Mr. Fritz, there was a group of Rivkin and Radler.  There

3   was -- there was a group out of Manhattan.  I don't

4   recall their names.  And there was something from Martin

5   Clearwater and Bell.

6   Q     And did you actually interview with each of these

7   firms?

8   A     Yes.

9   Q     And you ended up selecting Mr. Gann?

10  A     Yes, sir.

11  Q     And why is that or why was that?

12  A     Mr. Gann had the best reputation, and the other --

13  the other groups didn't -- they -- they seemed that they

14  were very much interested, but they didn't have that much

15  experience with a case like this.

16  Q     Were you comfortable with Mr. Gann when you met with

17  him initially?

18  A     Yes.

19  Q     What did you think of his professionalism?

20  A     I thought it was great.

21  Q     During the course of the time that he represented

22  you, did you meet with him and talk to him?

23  A     Yes.

24  Q     How did you find those meetings, and his demeanor,

25  and how he interacted with you?

Belfiore - Direct - Barket                    33

1   A    I thought that Mr. Gann, the way he carried himself,

2   his professionalism, I thought it was spectacular.  I had

3   no problem with any of that.

4   Q    And you got along with him personally?

5   A    Very much so.

6   Q    He gave you legal advice, and investigated the case

7   and talked to you about it?

8   A    Yes.

9   Q    Were you satisfied with the manner in which he was

10  representing you?

11  A    He seemed to know his stuff.

12  Q    Did he recommend or make a recommendation to you as

13  to what course of conduct you should take?

14  A    As in --

15  Q    Taking a plea or going to trial?

16  A    Yes, he recommended taking the plea.

17  Q    And in order to take the plea, what did you have to

18  do, what did you think you had to do with respect to your

19  practice?

20  A    Well, in all honestly -- in all honesty, between my

21  family, my friends, my patients, and my practice, are --

22  or I should say now were, my top priority in my life, and

23  I had to make sure that my patients were taken care of

24  before anything else was done.  And it wasn't moving as

25  fast as I wanted it to move.

Belfiore - Direct - Barket                    34

1  Q    Were you taking steps to transfer or sell your
2  practice to anther doctor?
3  A    Yes.
4  Q    Who was the doctor?
5  A    One of the doctors was a Dr. Navid from Hicksville.
6  Q    And did you engage attorneys to help you, and to
7  negotiate that, and to actually transfer the practice?
8  A    I was trying to, yes.
9  Q    And you wanted to do that as a pre-requisite or
10  before you entered a guilty plea?
11  A    Yes.
12  Q    When Mr. Gann was giving you advice to plead guilty,
13  how did you react to that?
14  A    I was kind of disappointed at the beginning because,
15  you know, you see all these things on TV -- this is my
16  first time ever in trouble with the law.  And so I have
17  no experience with this, I have no clue, I can only go by
18  what people say, and I -- I -- I had no idea.  So at the
19  beginning I was disappointed.
20       And so it took Marc -- you know, he was patient, he
21  was very patient -- he was not very patient, he was
22  overly patient, to explain, you know what I am saying,
23  what was going on, and how things were working, and how
24  all of this -- you know, how all this works.
25       You know, the best that I compare it to is, you know,

Belfiore - Direct - Barket                                     35

1    you being told that you have cancer, and then nobody is

2    explaining it to you properly but at least Mr. Gann was

3    there as my consult.

4    Q    Okay.  And the advice to --

5         MR. BARKET:  Withdrawn.

6    Q    The advice he was giving you take a guilty plea, how

7    did you react to that?

8    A    Like I said before, I was -- at the beginning, I was

9    disappointed.

10   Q    How about towards the end or as time had moved on?

11   A    As time moved on, it was something that I accepted, I

12   had to accept it, because at -- from what Mr. Gann

13   represented to me, there was really no way to really

14   fight this.

15   Q    You heard a discussion, I think -- I'm assuming you

16   did, with Mr. Gann, and myself, and counsel for the

17   government about a meeting that took place in October.  I

18   think the government labeled it as October 23rd of 2015.

19   Do you recall that meeting?

20   A    I couldn't recall the date but I -- there was

21   numerous meetings.

22   Q    Well, was there a meeting with Mr. Gann, and a number

23   of people, your family, or office manager, just before

24   you hired Mr. Liotti?

25   A    Correct.

Belfiore - Direct - Barket                    36

1   Q    And after that meeting, what was your intent with
2   respect to a guilty plea?
3   A    I was working towards accepting that plea.
4   Q    What do you mean by "working towards"?
5   A    I was -- like I said, my biggest -- my biggest
6   problem was making sure that the practice was settled,
7   and I can move forward without having any reservations.
8   Q    Did you take -- after the meeting, did you take any
9   affirmative steps to look for, or to hire another
10  attorney?
11  A    I had no -- I had no plans at that last meeting to
12  hire another attorney.
13  Q    Did you -- were you satisfied after that meeting with
14  the advice, and the representation -- the advice Mr. Gann
15  was giving you, and the representation that he was
16  providing you?
17  A    Yes.
18  Q    How is it that you met with Mr. Liotti?  How did that
19  come about?
20  A    I met Mr. Liotti through his son.  His son was a
21  well-known, and -- vendor within my office.  He sold
22  different type of healthcare supplies.  And he was aware
23  of my case because I had to keep everything open with all
24  my vendors and my patients.  They -- I didn't tell
25  anybody anything different because all they have to do is

Belfiore - Direct - Barket                                    37

1   go on the internet.

2   Q    In the days that followed or in the day or two that

3   followed your meeting with Mr. Gann and your family, did

4   you happen to run into Mr. Liotti's son?

5   A    Yes.

6   Q    How is that?

7   A    He came in on his usual routine day, that he would

8   come in and stop by and see if I needed any supplies.

9   Q    And what conversations, if any, about your case did

10  you have that day?

11  A    He asked me about how the case was going.

12  Q    What did you tell him?

13  A    I told him that I was going to have to take a plea.

14  Q    And how did he react to that?

15  A    He goes, "Did you talk to my father?"

16  Q    What did you say?

17  A    "Who is your father?"  You know, that was my first

18  question.  He says, "Well, my Dad is a criminal

19  attorney".  And so, he -- so he said -- so I said, "Does

20  he handle federal cases?"  He says, "Yeah, he handles a

21  lot of federal cases.  He's won a big -- a lot of big

22  federal cases, as well."

23       And so I said, to get another opinion at this stage

24  of the game, I said what could it hurt.  And so I called

25  him and I made an appointment.

Belfiore - Direct - Barket                                    38

1    Q    How quickly after you met with his son did you make

2    an appointment with Mr. Liotti?

3    A    That afternoon.

4    Q    And did you actually go in and meet with him?

5    A    Yes, I did.

6    Q    What advice did he give you at that first meeting?

7    A    At that first meeting, he said that he had -- he had

8    numerous cases such as mine where he did very, very well

9    with them.  He said he had a very high win rate.  He felt

10   that after hearing what I had to say that he -- if he

11   felt that there was at least a 30 percent chance of

12   winning, he would take it, and he would win.

13   Q    On --

14   A    He -- I'm sorry.

15   Q    That's okay.  Finish your thought.

16   A    He also said something which I found kind of alarming

17   but I didn't know how to take it, because for the most

18   part again, I have no experience with this, so he was

19   saying things like attorneys like -- like Mr. Gann, all

20   they do is take your money and settle.

21   Q    At that point, did you provide him with copies of the

22   videotapes that existed, and discovery or anything like

23   that.

24   A    At that moment, no.

25   Q    What did you do at that meeting or following that

Belfiore - Direct - Barket                                    39

1   meeting?

2   A    I'm not sure what you mean.

3   Q    Well, he indicated to you that he thought that he

4   could win, that there was no reason for you to take a

5   plea.

6   A    Right.  He said that there's no reason to take a

7   plea.

8   Q    And did he ask you to hire him?  Did he suggest you

9   hire him?

10  A    Yes.

11  Q    Did you do that?

12  A    Yes, I did.

13  Q    Right on the spot?

14  A    I think there was within the next day or the next

15  day.  It was -- it was shortly within that time frame.

16  Q    Within a few days of your meeting with Mr. Gann, and

17  your family?

18  A    Yes.

19  Q    And within a day or so of meeting his son?

20  A    Yes.

21  Q    And all of that took place within a -- how long a

22  period of time?

23  A    48 to 72 hours?  Well, when I met -- when I met with

24  Liotti's son to Liotti, there was a -- maybe about five

25  or six days between the meeting.  I am not exactly sure

Belfiore - Direct - Barket                                  40

1   of the dates --

2   Q    Okay.

3   A    -- where I left Mr. Gann's office to where I saw

4   Liotti's son.

5   Q    Okay.  Had Mr. Liotti told you or given you advice

6   similar to that which Mr. Gann gave you, which is that

7   the case was indefensible, and that you should plead

8   guilty, and significant reduce your exposure to federal

9   prison, what would you have done

10  A    It -- like Mr. Liotti's interpretation, his advice

11  was on the complete opposite side of the spectrum.

12  Q    Right.  I understand that but I am asking you had he

13  given you advice similar to Mr. Gann --

14  A    Oh, if he had given -- if had said the same thing

15  that, Mr. -- you know, that Mr. Gann said, I would have -

16  - I would -- I would have -- this thing -- this whole

17  case would have been over and done with by now.  I would

18  have done what Mr. Gann said.

19  Q    Which is what?

20  A    Take the plea.

21          MR. BARKET:  All right.  That's all I have,

22  thank you.

23          THE COURT:  All right.

24          Cross-examination?

25          MR. KING:  Thank you, your Honor.

                    Belfiore - Cross - King                    41

1    CROSS-EXAMINATION

2    BY MR. KING:

3    Q    Good morning, Doctor.

4    A    Good morning.

5    Q    Around October 16th of 2018, you signed an affidavit

6    in support of your motion to vacate your conviction,

7    right?

8    A    Yes, sir.

9    Q    And you stated in that affidavit that all your

10   statements in it were true, right?

11   A    Yes, sir.

12        MR. KING:  Your Honor, may I approach the

13   witness with a copy of the affidavit?

14        THE COURT:  Yes.

15   Q    Dr. Belfiore, in front of you now is a copy of the

16   affidavit that you signed on October -- around October

17   16, 2018.  You also said in that affidavit, that you

18   understood that false statements in it were punishable as

19   a crime, right?

20   A    Yes, sir.

21   Q    And nowhere in the affidavit do you say that you told

22   Marc Gann that you wanted to plead guilty, right?

23   A    No, it's not in the paper.

24   Q    Okay.  And nowhere in the affidavit do you say that

25   the sale of your medical practice was a prerequisite to

                    Belfiore - Cross - King                    42

1   your pleading guilty, right?

2   A     Correct.

3   Q     Okay.  Instead calling your attention to paragraph 4,

4   do you say the following, and read along with me:

5         "During the time -- during the period of time I was

6   considering accepting the plea, I had a conversation with

7   Mr. Liotti's son who I knew from my medical practice, he

8   suggested that I meet with his father, which I did."

9         Did I read that accurately?

10  A     Yes.

11  Q     Okay.  And you first met with Mr. Liotti around

12  Monday, October 26th of 2015, correct?

13            MR. BARKET:  I'm sorry?  Which Mr. Liotti?

14            MR. KING:  I'm sorry, yes, let me clarify.

15  Q     Thomas Liotti, your trial counsel; you first met with

16  him around Monday, October 26th of 2015, right?

17  A     I think so.  Yeah, I just -- I don't have all my

18  papers, they're -- I can't say the date exactly.

19  Q     You know that Mr. Liotti, your trial counsel, kept

20  time records, correct?

21  A     Yes, sir.

22  Q     You have no reason to dispute those records as to

23  your first meeting, right?

24  A     No, sir.

25  Q     Okay.

Belfiore - Cross - King                                    43

1   A    I just don't remember the dates.  It's --

2   Q    Okay.  Now before your trial, you testified in the

3   grand jury, correct?

4   A    Yes, sir.

5   Q    You did so on three occasions, right?

6   A    Yes, sir.

7   Q    Each time you were under oath, correct?

8   A    Yes, sir.

9   Q    And each time you were -- and when you testified in

10  the grand jury, you testified in substance that all of

11  your prescriptions were issued for legitimate medical

12  purpose, right?

13  A    Yes.  And that was the legitimate medical purpose

14  that Mr. Liotti had defined for me.

15           MR. KING:  Your Honor, could I strike the last

16  part of that answer as nonresponsive?

17           THE COURT:  No, I am going to let it stand.

18  Just try to focus on the question, Doctor.

19           THE WITNESS:  Oh, okay.

20           THE COURT:  Mr. Barket will get a chance to

21  follow-up on redirect, okay?

22  Q    You testified, in essence in the grand jury, that you

23  were innocent, correct?

24  A    Yes, sir.

25  Q    And you testified that undercover officer had tricked

                    Belfiore - Cross - King                    44

1   you into issuing him oxycodone prescriptions, right?

2   A    Yes, sir.

3            MR. KING:  Your Honor, at this time, I would

4   like to approach the witness with a document that is

5   currently before the Court in the record.  It's a notice

6   of claim that the defendant filed.  Can I approach him

7   with it?

8            THE COURT:  Yes.

9   Q    Dr. Belfiore, do you recognize that document?

10  A    Yes, sir.

11  Q    What do you recognize it to be?

12  A    It was a claim that Mr. Liotti had made on my behalf

13  for the damages done as a result of what he called

14  vindictive prosecution.

15  Q    Does it bear your signature?

16  A    Yes, it does.

17           MR. KING:  Your Honor, this record is already

18  in evidence in this proceeding.  It was entered by

19  defense counsel as part of his declaration but just to

20  avoid any confusion, I ask that it be entered now into

21  evidence, marked as MB-1.

22           THE COURT:  Any objection?

23           MR. BARKET:  I'm -- no, I don't object to the

24  document going in but when you say it's already in the

25  record and you said defense counsel, I just want to be

Belfiore - Cross - King                              45

1    clear, it wasn't entered by us, I think it was entered --

2            THE COURT:  Where in the record was this

3    entered?  I don't remember.

4            MR. KING:  The defense counsel submitted a

5    declaration in connection with the motion that's been on

6    the docket for --

7            THE COURT:  Are you talking about Mr. Liotti?

8            MR. KING:  Yes.

9            THE COURT:  Okay.

10           MR. BARKET:  Okay.  That's what --

11           MR. KING:  So it's in --

12           MR. BARKET:  I'm thinking of myself -- I'm

13   thinking of us as defense counsel.

14           THE COURT:  Okay.

15           MR. KING:  I'm sorry for the confusion.

16           MR. BARKET:  That's okay.

17           THE COURT:  Okay.  So just so it's clear, it is

18   admitted for purposes of the hearing.  Obviously, just so

19   the record is clear, any documentation that has

20   previously been submitted, is all part of the record in

21   terms of the Court's review of it, okay?

22           MR. KING:  Thank you, your Honor.

23   (Government's Exhibit MB-1 received into evidence.)

24   Q    So, Dr. Belfiore, looking that document now, the

25   notice of claim, on January 6th, 2017, you filed a notice

Belfiore - Cross - King                                        46

1   of claim against the United States government for

2   negligence, false imprisonment, prima facie tort, false

3   arrest, abuse of process, wrongful and malicious

4   prosecution, and there's several other claims in there,

5   right?

6   A    Yes, sir.

7   Q    Okay.  And the amount of money you wanted for this

8   claim or these claims was $30,500,000, correct?

9   A    Yes, sir.

10  Q    You signed this document under criminal penalty for

11  making false statements, right?  Take a look at the first

12  page of the document.  The bottom of the document, under

13  your signature, you see that civil -- for a civil penalty

14  for presenting a fraudulent claim?

15  A    Yes, sir.

16  Q    Okay.  And you see next to that, there's a criminal

17  penalty for presenting fraudulent or claims or making

18  false statements.  Do you see that on the document?

19  A    Yes, sir.

20  Q    Okay.  So you signed this document seeing those

21  penalties on the document, right?

22  A    Yes, sir.

23  Q    The claim states if you turn to page 4, that you

24  prescribed medication with a legitimate medical purpose,

25  is that right?

Belfiore - Cross - King                                    47

1   A    Um --

2              MR. BARKET:  Wait, wait, just --

3   A    I'm not exactly sure where you're --

4              MR. KING:  Could I approach, Judge?

5              THE COURT:  Yes.

6   Q    It's on page 4 of the document.  Right here.

7   A    Oh.

8   Q    Do you see that?  Do you see that now?

9   A    Yes, sir.

10  Q    Okay.  And it says that you prescribed medication

11  with a legitimate medical purpose, right?

12  A    Yes, sir.

13  Q    Okay.  And before trial, you appeared on television

14  several times, right?

15  A    Yes, sir.

16  Q    During an interview with Crime Watch Daily, you

17  stated that you couldn't accept the government's plea

18  offer because you couldn't plead guilty to something that

19  you didn't do, right?

20  A    Yes, sir.

21  Q    And you also told Crime Watch Daily that all your

22  oxycodone prescriptions were written for a legitimate

23  medical purpose, right?

24  A    Yes, sir.

25  Q    And you challenged the government in your interview

Belfiore - Cross - King                                    48

1  with Crime Watch Daily to prove its case against you,

2  right?

3  A    From what I recall, yes, sir.

4  Q    And you testified at trial, right?

5  A    Yes, sir.

6  Q    And on direct examination, you stated that all of

7  your oxycodone prescriptions were issued for a legitimate

8  medical purpose, right?

9  A    Yes, sir.

10  Q    You also introduced expert testimony at trial, right?

11  A    And one of your experts was Dean Olsen, correct?

12  A    Yes, sir.

13  Q    And Dean Olsen was a doctor of Osteopathy who works

14  at Nassau Medical Center, right?

15  A    Yes, sir.

16  Q    And he testified about your oxycodone prescribing

17  practices, correct?

18  A    Yes, sir.

19  Q    And he testified that all of your oxycodone

20  prescriptions at issue in trial were issued for a

21  legitimate medical purpose, correct?

22  A    From what I recall, yes.

23  Q    Before you fired Marc Gann, you never sold your

24  medical practice, right?

25  A    No, sir.

Belfiore - Cross - King                                    49

1   Q    You continued operating it from the time you hired

2   Marc Gann, through the time you fired him, and through

3   the end of your trial, correct?

4   A    Yes, sir.

5              MR. KING:  Your Honor, may I approach the

6   witness with a copy of the second superseding indictment?

7              THE COURT:  Yes.

8   Q    Doctor, in front of you now is a copy of the second

9   superseding indictment issued by the grand jury against

10  you.  Do you see it?

11  A    Yes, sir.

12  Q    You're familiar with that document, right?

13  A    Yes.

14  Q    In it 26 prescriptions are listed, right?

15  A    Yes, sir.

16  Q    Those prescriptions were issued by you, correct?

17  A    Yes, sir.

18  Q    All of them were for oxycodone, right?

19  A    Yes, sir.

20  Q    And all of them were for oxycodone in a dosage of 30

21  milligrams, correct?

22  A    Yes, sir.

23  Q    The amount of pills at issue with respect to each of

24  those prescriptions ranges between 90 and 180, correct?

25  A    Yes, sir.

Belfiore - Cross - King                                    50

1  Q    And the period of time in which you issued those 30
2  milligram oxycodone prescriptions runs between 2011 and
3  2013, right?
4  A    Yes, sir.
5  Q    Which of these prescriptions did you believe at the
6  time you issued it was not for a legitimate medical
7  purpose?
8  A    At the time when this statement was made, I would say
9  all of them?  I've -- according to the definition that I
10 was given for legitimate medical purpose.
11 Q    No, I am going back to the time that you issued the
12 prescriptions as a doctor, when you issued them which did
13 you believe were not for a legitimate medical purpose?
14 A    I can't say.
15 Q    Did you believe that they were all issued for a
16 legitimate medical purpose when you issued them?
17 A    Yes.
18 Q    Before testifying today, did you review your
19 affidavit with your attorney?
20 A    Yes.
21 Q    Did you do so multiple times?
22 A    No.
23 Q    You reviewed your affidavit with your attorney once?
24 Is that what you're saying?
25 A    We -- it's -- it's -- from where I am located now,

Belfiore - Cross - King                                        51

1   it's difficult to have multiple meetings.

2   Q    Just to be clear, did you -- how many times did you

3   discuss the content of your --

4              MR. BARKET:  I'm sorry, Judge.  This is -- I

5   know that he waives the privilege with respect to other

6   lawyers.  He hasn't waived the privilege with respect to

7   me.

8              THE COURT:  Yes, sustained.

9   Q    Did you discuss your affidavit with anyone other than

10  your attorney?

11  A    No, sir.

12  Q    Before you came to testify today, did you prepare to

13  testify with your attorney?

14             MR. BARKET:  Objection.

15             THE COURT:  Yes, sustained.

16  Q    Before coming to testify today, did you prepare to

17  testify by consulting with anyone other than your

18  attorney?

19  A    No.  No, sir.

20  Q    During trial, you maintained a Facebook account,

21  correct?

22  A    Yes, sir.

23             MR. KING:  Your Honor, may I approach the

24  witness with some documents?

25             THE COURT:  Yes.  I don't remember now, are

Belfiore - Cross - King                              52

1    those part of the records too or those are new?

2              MR. KING:  They are not, your Honor.

3              THE COURT:  Okay.

4              MR. KING:  I'm going to attempt to offer them

5    now.  Is there any objection to their being entered?

6              MR. BARKET:  No, we've seen them.  Thank you.

7              MR. KING:  Okay.  In that case, your Honor, I

8    am just going to proceed with questioning about them.

9              THE COURT:  Yes, I guess we should give it an

10   exhibit number of something new.

11             MR. KING:  Yes, I do have numbers for each of

12   them.

13             THE COURT:  Okay.

14             MR. KING:  These are nonsequentially

15   unfortunately, but just for the record, marked as

16   Government's Exhibit's MB-14, MB-13, MB-10, MB-9, MB-8,

17   MB-6, MB-7 -- and MB-7.

18             THE COURT:  I'm sorry, you said MB-7, and then

19   what was the last one?

20             MR. KING:  There's nothing -- no other ones

21   after that.  Just MB-7.

22             THE COURT:  I thought you said 7 twice then.

23             MR. KING:  I apologize.

24             THE COURT:  All right.

25             MR. KING:  MB-6, and then MB-7.

Belfiore - Cross - King                          53

1              THE COURT:  Any objection to those?

2              MR. BARKET:  No.

3              THE COURT:  All right.  So those documents are

4    admitted -- those exhibits are admitted for purposes of

5    the hearing.  All right.

6    (Government's Exhibits MB-6 through MB-10, MB-13 and MB-

7    14 were received into evidence.)

8              THE COURT:  Go ahead.

9    Q    All right, so, Doctor, did you have a chance to look

10   through those?

11   (Pause)

12   Q    Did you have a chance to look at those?

13   A    Yes, sir.

14   Q    Okay.  So those are from your FAcebook account,

15   right?

16   A    Yes, sir.

17   Q    And during th trial, you publicly posted statements

18   about your assessment of how the trial was going, right?

19   A    Yes.

20   Q    Let me call your attention first to MB-14.  Did you

21   state that Tom Liotti was a great lawyer?

22   A    Yes, I did.

23   Q    Okay.  Did you also say that you were walking into

24   court with your head held up so high that you thought

25   your neck was going to snap?

Belfiore - Cross - King                                      54

1  A    Yes, sir.

2  Q    Okay.  Let me call your attention now to MB-13.  On

3  that date, you said you were feeling pumped, right?

4  A    On 13?

5  Q    Top part?

6  A    Yes.

7  Q    Okay.  And that was because you thought that truth

8  was going to prevail, right?

9  A    Yes, sir.

10  Q    Okay.  Turning next to MB-10, on May 10th, 2018, you

11  wrote on Facebook that all of the experts you called at

12  trial did a spectacular job, right?

13  A    Yes, sir.

14  Q    And you stated that you and your supporters have to

15  show the government that doctors shouldn't have to be

16  afraid to treat patients with compassion and respect,

17  right?

18  A    Yes.

19  Q    And you said that this was a fight that would benefit

20  you all in the long run, is that right?

21  A    Yes.

22  Q    All right.  I want to call your attention now to MB-

23  9. Just one day before the post that we just read, did

24  you state that another one of your experts, Dr. Blum

25  (ph.), did one hell of a job?

Belfiore - Cross - King                                    55

1    A    Yes.

2    Q    Okay.  Calling your attention to the next document,

3    MB-8, day before that on May 8th, did you write that you

4    hoped that the jury was at least half impressed with

5    another one of your experts, Dean Olson, as you were?

6    A    Yes.

7    Q    You started testifying on May 2nd, correct?

8    A    I don't recall.

9    Q    The next document might refresh your recollection.

10   Let's take a look at MB-6.  You were looking forward to

11   testifying, right?

12   A    Well, yes.

13   Q    Okay.  And on May 2nd, 2018 on Facebook, you wrote,

14   "Today, I finally get to testify."  Right?

15   A    Yes.

16   Q    And you also wrote I get to tell my side of the story

17   for once, right?

18   A    Yes.

19   Q    You were so excited about testifying that you wrote,

20   "Time to rock this joint" with a bunch of exclamation

21   marks, right?

22   A    Yes.

23   Q    And you testified for two days, correct?

24   A    It was either two or three days.

25   Q    Okay.  On the second day of your testimony, May 3rd,

Belfiore - Cross - King                                56

1  2018, turning to MB-7, did you write that -- did you

2  write, "Hit them with the truth is all I can do."  You

3  wrote that, right?

4  A    Yes.

5  Q    And then you again express your excitement writing,

6  "Going to rock this joint" with exclamation points,

7  right?

8  A    Yes.

9  Q    Okay.  I want to turn your attention back to the

10  meeting that you had with Mr. Liotti's son.  Okay.

11           MR. KING:  Judge, can I approach to take those

12  documents now?

13           THE COURT:  Sure.  Just make sure you leave a

14  copy with the Court, okay?

15           MR. KING:  Yes.

16  Q    I want to call your attention now to your meeting

17  with Mr. Liotti's son, okay?  Before that meeting, had

18  you had a meeting with Marc Gann and members of your

19  family and friends?

20  A    Yes.

21  Q    Okay.  And at that meeting, did Marc Gann urge you to

22  plead guilty

23  A    Yes.

24  Q    And at that meeting -- and before -- even before that

25  meeting, had Marc Gann for months been urging you to

Belfiore - Cross - King                                    57

1    plead guilty?

2    A    Yes.

3    Q    Did he discuss with you the evidence that the

4    government would introduce against you, such as the

5    undercover videos?

6    A    Yes.

7    Q    Did he discuss with you the expert opinion that he

8    had retained demonstrating that you did not have a

9    defense with respect to your interactions with the

10   undercover?

11   A    Yes.

12   Q    Did he discuss with you his reverse proffer with AUSA

13   Gatz where she explained the government's case and

14   position to him?

15   A    Yes.

16   Q    Did he also speak to you about his information that

17   he got about the DEA warning you about your oxycodone

18   prescribing practices?

19   A    Yes.

20   Q    Did he also provide you with information that he

21   testified about earlier today about drug-seeking

22   individuals overrunning your practice?

23   A    Yes.

24   Q    Okay.  He had provided you with all that information

25   before you met Mr. Liotti's son, right?

Belfiore - Redirect - Barket                          58

1    A     Yes.

2    Q     And he had urged you to plead guilty, right?

3    A     Yes.

4    Q     And at the time that you met Mr. Liotti's son, you

5    were considering that, correct?

6    A     No, before that we were just about deciding where we

7    -- like I said before, we were waiting for the sale of

8    the practice.

9    Q     Doctor, do I have to show you your affidavit again?

10   You wrote in your affidavit you were considering that at

11   the time --

12   A     Yes.

13   Q     -- you met Mr. Liotti's son.

14   A     I -- I -- I would say my definition of considering,

15   that's what I meant by considering.

16   Q     Okay.  And after having all that information, you

17   elected to hire Mr. Liotti after meeting with him,

18   correct?

19   A     Yes.

20              MR. KING:  Nothing further, your Honor.

21              THE COURT:  Okay.

22              Redirect?

23   REDIRECT EXAMINATION

24   BY MR. BARKET:

25   Q     Just a -- what's a prima facie tort?

1  A    I haven't the slightest idea.

2  Q    Oh --

3  A    If it has nothing to do with a gall bladder, an

4  ankle, or knee, I would not know.

5  Q    Who prepared the $30 million claim?

6  A    That was Mr. Liotti.

7  Q    And as part of his legal advice to you, he thought or

8  he told you that was a good thing to do, and it would

9  help your case in some way?

10  A    Not like that.  He said this is part and parcel for

11  every federal case.

12  Q    Every federal case he says you should file a $30

13  million lawsuit?

14  A    Yes.

15  Q    Okay.  Did you have any sense yourself of filing any

16  lawsuit before you got this advice from Mr. Liotti?

17  A    I had no clue that you could even do something like

18  that.

19  Q    Whose idea was it to go on television?

20  A    Mr. Liotti's.

21  Q    Did he advise you to do that?

22  A    Yes, he did.

23  Q    Did he tell you that he thought that would be helpful

24  to your case?

25  A    He thought it would be one of the best things to get

Belfiore - Redirect - Barket                        60

1   our story out there?

1   Did he prepare you in order to talk on TV, what you

2   should say, things like that?

3   A    Yes.

4   Q    Whose idea was it for you to testify in front of the

5   grand jury?

6   A    Mr. Liotti's.

7   Q    Again, did he prepare you, and talk about what you

8   should testify to, and how you should approach things?

9   A    Yes.

10  Q    With respect to the Facebook account, did you attach

11  articles to some of the postings?

12  A    Yes, I was recommended to do so.

13  Q    What kind of articles did you attach?

14  A    Articles that Mr. Liotti had written regarding his

15  now experience with my case.

16  Q    So he asked you to post stuff or material on Facebook

17  that were articles that he wrote about himself in your

18  case?

19  A    Yes.

20  Q    And did you follow his advice?

21  A    Yes.

22  Q    I want to go back to something you said on cross a

23  couple of times, your understanding of legitimate medical

24  reason.  What was your understanding, if you can recall,

25  from what Mr. Liotti said?

Belfiore - Redirect - Barket                          62

1    A    Well, Mr. Liotti defined legitimate medical --

2    medical purpose as -- as long as somebody was complaining

3    about pain, it was a legitimate medical purpose.

4    Q    With respect to the undercover officer, did you

5    recommend that he engage in testing prior to or during

6    the course of your treatment of him?

7    A    I recommended, yes.

8    Q    Did he do that?

9    A    No, he didn't.

10   Q    Did you make notations in the -- his medical file

11   concerning --

12           THE COURT:  Wait, wait, sorry, say that -- can

13   you just -- I missed that for a second.  What was that

14   question?

15           MR. BARKET:  Did you make notations in his

16   medical file --

17           THE COURT:  No, the question before that.

18   Q    Did you recommend that he engage in testing --

19   A    Yes.

20   Q    -- x-rays, and things like that.

21           THE COURT:  Okay.

22   Q    Did --

23           MR. BARKET:  I was about to say can we have it

24   read back.

25   Q    And did he engage in that testing?

Belfiore - Redirect - Barket                    63

1   A    No, he didn't.

2   Q    Did you make notations in the file?

3   A    I don't recall.

4   Q    Did you make any notations in his medical file that

5   weren't true?

6   A    Not so much not true but to my estimations, but my --

7   what I had written in the chart was not a whole truth.

8   Q    Which part of it was false, or not whole truth?

9   A    Well, it was my interpretation of what he would be

10  doing, why he would come back for the practice.  It was a

11  sloppy move on my -- my part.

12  Q    Your understanding of legitimate medical purpose, has

13  that changed at all since Mr. Liotti stopped representing

14  you?

15  A    Yes.

16  Q    Why did you hire Mr. Liotti?

17  A    When I met Mr. Liotti, as I was saying before, he

18  gave a totally different perspective on how the case

19  should be handled.  He said that he had handled cases

20  like this in the past, and had won.  He was -- he was

21  basically saying it's one of these things where it's

22  like, why are you taking the plea where you could win

23  this flat out?  You wouldn't have to sell your practice.

24  You wouldn't have to do anything to get to back to work

25  on Monday, after the case -- the case was done.

1          MR. BARKET:  Judge, I think that we can agree

2    on some dates.  I would be happy to enter a stipulation

3    to that effect.  I think the meeting that we've referred

4    to -- Mr. Gann referred to is defined -- the government

5    mentioned at one point, October 23rd.  We agree.  We

6    think that that's correct based upon some emails that

7    exist.

8          THE COURT:  Okay.

9          MR. BARKET:  And that Mr. Liotti fired or faxed

10   over to Mr. Gann, a notice that he was substituting in

11   for Mr. Gann on October 28th, both in 2015.

12         THE COURT:  Agreed?

13         MR. KING:  Judge, just one second.  Can I just

14   speak to defense counsel briefly?

15         THE COURT:  Sure.

16   (Counsel confer)

17         MR. KING:  Judge, I just need to review

18   something.

19         THE COURT:  Okay.

20   (Pause)

21         MR. KING:  Judge, there's no objection to that.

22   We can stipulate to that.

23         THE COURT:  Okay.

24         MR. BARKET:  So just to be clear, the meeting

25   that Mr. Gann testified to where Dr. Belfiore was there,

Belfiore - Redirect - Barket                    65

1   and other members of his family, and another lawyer, and

2   so forth, was October 23rd.  Mr. Gann notified the

3   government that he had been substituted on October 28th,

4   both 2015.  So it's a --

5           And again for the record, I think we can take

6   judicial notice of this, but October 23rd of 2015 was a

7   Friday.

8           MR. KING:  That's correct.

9           THE COURT:  Okay.

10  Q    So given those dates, do you remember what day Mr.

11  Liotti's son came to see you?

12  A    Not exactly.  Not specifically.  I couldn't give you

13  an exact date.

14  Q    But it would be in between the 23rd and the 28th?

15  A    I could say yes.

16          MR. BARKET:  One second.  I'm sorry, one

17  second, Judge.

18  (Pause)

19          MR. BARKET:  Just one or two more questions.

20  Q    Following hiring Mr. Liotti, did you continue to

21  investigate the sale of your practice?

22  A    Yes.

23  Q    Did you sell the practice?

24  A    No.

25  Q    Did you continue to practice?

Belfiore - Redirect - Barket                          66

1   A    Yes.

2   Q    As you were heading to -- why were you still

3   investigating the sale of your practice after you made a

4   decision to proceed to trial?

5   A    Well, since the -- I had surrendered my DEA

6   certificate, I found other treatment plans, and treatment

7   procedures, and -- that were working very, very well for

8   a lot of my patients, and I wanted to take that and go

9   forward.  So if I could have somebody to maintain the

10  medical practice, and start investigating and working

11  towards other clinics, it was my goal to do so.

12  Q    And --

13  A    And Mr. Liotti said there was no reason for me to

14  even consider shutting down my practice.

15  Q    Because?

16  A    It's going to be sure fire win.

17          MR. BARKET:  Nothing further.  Thank you.

18          THE COURT:  I have a couple of questions,

19  Doctor.  These are -- some are some questions I asked of

20  Mr. Gann regarding first the sale of the practice.

21  During that nine-month period, can you tell the Court a

22  little bit more about what you -- what was going on with

23  respect to the sale of the practice, if anything?  What

24  was going on during those nine months that was holding up

25  the plea?

1    THE WITNESS:  A lot of -- a lot of the problems
2    that I was having was dealing with negative press because
3    as soon as somebody would see my practice, and they would
4    -- they would say oh, this is great, I'm very much
5    interested, they would suddenly go home, and then the
6    next day I would call to say how -- you know, what did
7    they think, and they're like no, I'm not interested, not
8    interested, and I was like why.  And they were like
9    because I saw what the -- the government posted about you
10   on the internet.  They saw what Newsday had posted on the
11   internet.  They saw what the other newspapers, and
12   magazines, and -- they saw what they -- was posted on TV.
13   So I --
14        THE COURT:  So how was that going to get better
15   though?  Wasn't it clear to you that if that was the
16   obstacle to the sale of the business, that wasn't going
17   to change, right?
18        THE WITNESS:  It wasn't so much the -- like I -
19   - for the sale, it was even impossible to get somebody to
20   come in just to take over, and just take the patients
21   over because they feel that just because a couple of
22   patients had prescription problems, they felt that the
23   whole -- the whole practice was a prescription problem,
24   which wasn't the -- was the farthest from the truth.
25        THE COURT:  All right.  And then I asked Mr.

Belfiore - Redirect - Barket                              68

1  Gann about any discussions that you may have had with him

2  or with other people about what your ability would have

3  been to practice medicine after -- if you ended up

4  serving jail time, after you served jail time.  Was there

5  -- did you investigate that?  Was that part of your

6  thinking?  Was that not part of your thinking?

7          THE WITNESS:  Yes, that was part of my

8  thinking.

9          THE COURT:  And what was your understanding of

10 what was -- what possibility there was of that?

11         THE WITNESS:  There was a good possibility,

12 yes, that I would be able to practice once this whole

13 situation was resolved.

14         THE COURT:  And your understanding regarding

15 that never changed?

16         THE WITNESS:  No, there's no way I could change

17 that.

18         THE COURT:  No, I mean you didn't develop that

19 understanding.  That's what you believed throughout your

20 negotiations with the government up until the time you

21 retained Mr. Liotti, during that whole period of time

22 with Mr. Gann, you believed that even if you pled guilty,

23 you were going to continue to be able to practice

24 medicine once you served whatever jail time that you --

25         THE WITNESS:  That wasn't the priority.  The

Belfiore - Redirect - Barket                    69

1  priority was just getting the practice handed over to

2  somebody who would be willing to take over my protocols

3  and procedures.

4            THE COURT:  Okay.  All right.  And then with

5  respect to your meeting -- your initial meeting with Mr.

6  Liotti, I think you said you retained him almost

7  immediately based upon his assessment?

8            THE WITNESS:  Your Honor, I think it was within

9  24 hours.

10           THE COURT:  But he had -- did he have

11  information regarding the evidence in the case?  Did he

12  have, for example, the video of the undercover or

13  anything regarding the government's evidence when he

14  spoke to you about his assessment?

15           THE WITNESS:  No, he didn't -- I don't -- I

16  don't -- all I know is when he received the videos is

17  when I handed them to him.  He said that he had enough

18  from what he read on the -- what he found online, enough

19  to figure out whether or not he could defend this case,

20  and if it was a winnable case.

21           THE COURT:  I know, but given what Mr. Gann had

22  gone through with you, all the different things that Mr.

23  -- that the prosecutor went through with you about, and

24  Mr. Gann spoke about all these different things he was

25  telling you, made the case indefensible, obviously Mr.

Belfiore - Redirect - Barket                    70

1   Liotti didn't have access to all that information.  That

2   wasn't all out in the newspaper, right?

3           THE WITNESS:  That I am not sure.  Again, he --

4   I came to him as an expert, just as I would go to anybody

5   else for -- for a second -- second, third, or fourth

6   opinion.

7           THE COURT:  But didn't it occur to you -- I

8   mean, you're an intelligent guy, didn't it occur to you

9   at all that how can he make an assessment of my case if

10  he doesn't have the evidence?  That didn't occur to you

11  when you're hearing this?

12          THE WITNESS:  Because I gave him whatever

13  information I had, you know what I am saying -- I had

14  with me that day, you understand, when I first met with

15  him.  And within the -- within the 24 hours, he said yes,

16  this is something I could defend.

17          THE COURT:  Okay.  And then I think you said

18  before that he told you he had won other cases like this

19  and --

20          THE WITNESS:  Yes, he did.

21          THE COURT:  Did you ask him like -- when you

22  said other cases like this, you meant a doctor, or -- I

23  don't know what that means, or maybe you didn't know what

24  that means.  What does that mean, other cases like this?

25          THE WITNESS:  I didn't ask to that detail, and

Belfiore - Recross - King                          71

1   I should have.

2               THE COURT:  Oh, so you didn't check into that?

3               THE WITNESS:  Correct.

4               THE COURT:  Okay.

5               I don't know if anyone has any questions.

6               MR. KING:  Very, very briefly, your Honor.

7               THE COURT:  Go ahead.  Do you want to -- do you

8   want to go first?

9               MR. BARKET:  That's fine.  It doesn't matter.

10              THE COURT:  Okay, go ahead.

11              MR. KING:  Thank you, your Honor.

12  RECROSS-EXAMINATION

13  BY MR. KING:

14  Q    Dr. Belfiore, after you got this advice from Tom

15  Liotti, you didn't go back to Marc Gann and check in with

16  him, did you?

17  A    No, he told -- Mr. Liotti told me there was no reason

18  to.

19  Q    And you didn't do it on your own, right?  You didn't

20  do it on your own, right?  You didn't go and speak to

21  Marc Gann after you got this information from Tom Liotti,

22  right?

23  A    No, Mr. Liotti said there was no reason to do so,

24  don't.

25              MR. KING:  Nothing further, Judge.

Belfiore - Further Redirect - Barket                    72

1              MR. BARKET:  Could I ask -- one question I

2    forgot to ask --

3              THE COURT:  Sure.

4              MR. BARKET:  -- before.

5              THE COURT:  You can ask whatever you want.

6              MR. BARKET:  Thanks.

7    FURTHER REDIRECT EXAMINATION

8    BY MR. BARKET:

9    Q    Doctor, how much press did you do while you were

10   represented by Mr. Gann?

11   A    Nothing.  Mr. Gann was against it.

12   Q    He didn't recommend you post things on Facebook, do

13   TV interviews, testify?

14   A    No, Mr. Gann was against all of that.

15   Q    And the judge asked you just now, whether or not Mr.

16   Liotti had this information, for example, the videotapes

17   of the undercover officer coming, and you said no, I gave

18   those to him.  And I want to be clear, when did you

19   provide the videotapes?

20   A    If I recall, I gave it to him the night when we first

21   -- I first met with him.

22   Q    You had -- so the night that you first met with him,

23   you had videotapes and you gave them to him?

24   A    Correct.

25   Q    And he reviewed those or said he did?

Belfiore - Further Redirect - Barket                73

1  A    He said he did.  Yeah, he didn't review it in front

2  of me.

3  Q    So when you went to him that first time, you met with

4  him, talked to him, gave him the videotapes?

5  A    Correct.  He said bring -- I recall, bring stuff, so

6  I brought materials that I had and he said that he had

7  seen things on the internet, as well.

8  Q    What did he -- he had seen things on the internet?

9  Are you referring to court documents?

10 A    Yes.

11 Q    Okay.  And so you met with him that first night, and

12 he said he would make an assessment and tell you whether

13 or not he thought the case was what you should do?

14 A    He said that at that -- at that first meeting, he

15 said if he felt that this case was at least 30 percent

16 winnable, he would take it.

17 Q    And then he -- you contacted him again the day later

18 or within a day?

19 A    I don't recall.  I think he contacted me.

20 Q    And what did he tell you after looking at this?

21 A    He said he wanted the case.

22 Q    And what did he say about the chances of prevailing?

23 A    He said this was a -- he said this was a slam dunk.

24 Q    In what way?  For who?

25 A    It was -- well, right now obviously it wasn't for me,

Belfiore - Further Recross - King                    74

1   but --

2   Q    Well, no, but when he said this was a slam dunk, was

3   he referring to you?  He's saying that you would be able

4   to win this easily?

5   A    Correct.

6   Q    And that's when you hired him?

7   A    Yes.

8              MR. BARKET:  Thank you.

9              THE COURT:  Thank you for clarifying that

10  because I misunderstood what he said.  I didn't realize

11  Mr. Liotti had the videos when he made his --

12             MR. BARKET:  I frankly didn't know which way it

13  went, so --

14             THE COURT:  All right.  So -- okay, you could

15  step down.

16             MR. KING:  Your Honor?

17             THE COURT:  Yes.

18             MR. KING:  Could I just clarify something very

19  briefly?

20             THE COURT:  Yes, sure.

21  FURTHER RECROSS-EXMAINATION

22  BY MR. KING:

23  Q    Doctor, just very briefly, your statement that Tom

24  Liotti told you that the case was a slam dunk.

25  A    Yes.

Proceedings                                                        75

1  Q    Remember just saying that?  That's nowhere in your

2  affidavit, right?

3  A    No, sir.

4            MR. KING:  Okay.  Nothing further, Judge.

5            THE COURT:  All right.  You could step down,

6  Doctor.  Thank you.

7            All right. So are there any other witnesses for

8  the defendant?

9            MR. BARKET:  Given the limited scope of the

10  hearing, Judge, that's all we would introduce at this

11  point.

12            THE COURT:  All right.  And I think I had told

13  the government that I would give them a chance once they

14  heard the defendant's witnesses to decide whether they

15  want to call any witnesses.  So I don't -- Mr. King, do

16  you know whether you want to do that now, or do you need

17  time to discuss it?

18            MR. KING:  What I would like to do, your Honor,

19  with the Court's permission is to review the transcript,

20  discuss with my colleagues, and then we'll order the

21  transcript as soon as possible, and then I would like to

22  advise the Court either by correspondence or in a filing,

23  what we would propose to do.

24            THE COURT:  All right.  So give me -- I want to

25  set a date for that, two weeks, is that --

Proceedings                                        76

1          MR. KING:  Two weeks is acceptable, Judge.

2          THE COURT:  All right.  So the filing, if --

3   it's going to indicate one of two things.  The government

4   wishes to, you know, call XY witnesses at a hearing, or

5   if you don't, just indicate the government rests on its

6   papers.  And then I don't -- I'm not requesting this but

7   does anyone at this point wish to put anything in in

8   writing post-hearing? I don't know if -- if you want to

9   do that, I will give you --

10         MR. BARKET:  Our inclination would be yes.  I

11  think there's some things in the trial transcript that

12  are worth highlighting.

13         THE COURT:  Okay.

14         MR. BARKET:  So I think we would want to do

15  that.

16         THE COURT:  All right.  So why don't we wait

17  for this letter.  If the government decides not to call

18  any witnesses, call Mr. Barket and just agree upon a

19  schedule for him to put in his submission for the

20  government to respond, and then unless I have questions,

21  I won't schedule oral argument or anything.  I'll just

22  take it on submission, okay?

23         MR. KING:  Yes, Judge.

24         THE COURT:  Is that good?

25         MR. BARKET:  Yes, your Honor.

Proceedings                                    77

1          THE COURT:  All right.  So two weeks from

2    today, just so we have a date, is the 22nd of July, the

3    government will put in that letter.  All right?  Okay.

4    Thank you.  Have a good day.

5          MR. KING:  Thank you, your Honor.

6               (Matter concluded)

7                    -o0o-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

78

1                      I  N  D  E  X

2

3  DEFENDANT'S WITNESS:

4  Marc Gann:

5  Direct Examination by Mr. Barket. . . . . . . . . . . . . 4

6  Cross-Examination by Mr. King. . . . . . . . . . . . . . 18

7

8  Michael Belfiore:

9  Direct Examination by Mr. Barket. . . . . . . . . . . . 30

10  Cross-Examination by Mr. King. . . . . . . . . . . . . . 41

11  Redirect Examination by Mr. Barket. . . . . . . . . 58, 72

12  Recross-Examination by Mr. King. . . . . . . . . . 71, 74

13

14                  E  X  H  I  B  I  T  S

15  Government's Exhibits Received in Evidence:

16  MB-1. . . . . . . . . . . . . . . . . . . . . . . . . . 45

17  MB-6. . . . . . . . . . . . . . . . . . . . . . . . . . 53

18  MB-7. . . . . . . . . . . . . . . . . . . . . . . . . . 53

19  MB-8. . . . . . . . . . . . . . . . . . . . . . . . . . 53

20  MB-9. . . . . . . . . . . . . . . . . . . . . . . . . . 53

21  MB-10. . . . . . . . . . . . . . . . . . . . . . . . . . 53

22  MB-13. . . . . . . . . . . . . . . . . . . . . . . . . . 53

23  MB-14. . . . . . . . . . . . . . . . . . . . . . . . . . 53

24

25

79

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **July**, 2019.

*Linda Ferrara*
Linda Ferrara

CET**D 656
Transcriptions Plus II, Inc.